IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTTSDALE INSURANCE COMPANY & )
AMERICAN SAFETY CASUALTY )
INSURANCE COMPANY, )
                                          )   Case No. 07 C 1990
       Plaintiffs, )
                                          )   Judge Virginia M. Kendall
  v. )

CITY OF WAUKEGAN, )

       Defendant. )
-------------------------------------------------- )
CITY OF WAUKEGAN, )

       Counter-Plaintiff, )

  v. )

SCOTTSDALE INSURANCE COMPANY, )
AMERICAN SAFETY CASUALTY )
INSURANCE COMPANY, INTERSTATE )
INDEMNITY COMPANY, CERTAIN )
UNDERWRITERS AT LLOYDS OF LONDON, )
NORTHFIELD INSURANCE COMPANIES, )
WESTPORT INSURANCE CORPORATION, )
EVANSTON INSURANCE COMPANY, S. )
ALEJANDRO DOMINGUEZ, AND PAUL )
HENDLEY, )

       Counter-Defendants. )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Scottsdale Insurance Company ("Scottsdale") and American Safety Casualty

Insurance Company ("American Safety") filed separate Complaints for Declaratory Judgment

1

against the City of Waukegan ("Waukegan") on January 8, 2007 and April 11, 2007 respectively, seeking declarations that they do not owe coverage to Waukegan for its obligations in the lawsuit *S. Alejandro Dominguez v. Paul Hendley et. al.*, No. 04 C 2907 (the "*Domiguez* case"). The Court consolidated these two cases on January 3, 2008. On March 20, 2008, Waukegan filed a First Amended Counterclaim against Counter-Defendants Scottsdale, American Safety, Interstate Indemnity Company ("Interstate"), Certain Underwriters at Lloyds of London ("Certain Underwriters"), Northfield Insurance Companies ("Northfield"), Westport Insurance Corporation ("Westport") (formerly Coregis Insurance Organizations), Evanston Insurance Company ("Evanston"), S. Alejandro Domiguez ("Dominguez"), and Paul Hendley ("Hendley"). American Safety, Northfield, Certain Underwriters, Westport, and Interstate (collectively "Objecting Counter-Defendants"), have filed four separate Motions to Strike the Report and Bar the Testimony of Waukegan's Expert, Donald J. Brayer ("Brayer"). For the reasons stated below, the Court grants in part and denies in part these four motions, striking the portions of Brayer's report that contain improper legal conclusions and barring his testimony as to those conclusions at trial.

## BACKGROUND

Domiguez filed suit against Waukegan and several of its police officers in the Northern District of Illinois, alleging claims of false arrest, malicious prosecution, and deprivation of constitutional rights under 42 U.S.C. § 1983, as well as respondeat superior and indemnification claims against Waukegan. Amend. Ctrclm. ¶¶ 34, 36. On October 17, 2006, the jury found in favor of Domiguez and against Paul Hendley, a Waukegan police officer, and awarded Domiguez $9,063,000.00. *Id.* ¶ 15. The Court held Waukegan liable as indemnitor for all sums Hendley was required to pay. *Id.*

Northfield and Certain Underwriters issued Law Enforcement Liability insurance policies to Waukegan that were in effect between November 1, 1991 and November 1, 1995. *Id.* ¶¶ 147, 191. Westport also issued primary and umbrella policies to Waukegan effective between November 1, 1997 and November 1, 2000. *Id.* ¶ 221. American Safety issued two policies to Waukegan, effective November 1, 2000 through November 1, 2001 and November 1, 2001 through November 1, 2002. *Id.* ¶ 37. Finally, Interstate issued a Commercial Umbrella Policy to Waukegan covering excess over American Safety's November 1, 2001 through November 1, 2002 insurance policy. *Id.* ¶ 118. In its First Amended Counterclaim, Waukegan seeks a declaratory judgment that each of these policies should have covered the underlying judgment in the *Dominguez* case. *Id.* ¶ 16. On December 23, 2009, Waukegan served its Supplemental Rule 26(a)(2)(A) disclosures and attached Brayer's Expert Report and Opinions. (*See* R. 383-1.)

### **STANDARD**

The admissibility of scientific expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Courts apply a three-step admissibility analysis for expert testimony under Rule 702 and *Daubert*. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed.R.Evid. 702). Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert*, 509

3

U.S. at 592-93). Courts are, however, granted "broad latitude when [they] decide[] *how* to determine reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S 137, 142 (1999). Finally, the expert's testimony must be relevant, or "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Ervin*, 492 F.3d at 904.[1]

## DISCUSSION

### I. Qualifications and Methodology

As an initial matter, none of the Objecting Counter-Defendants challenges Brayer's expert qualifications, and this Court finds that a Chartered Property Casualty Underwriter, Registered Professional Liability Underwriter, Associate in Claims, Associate in Reinsurance, and Construction Risk Insurance Specialist with an MBA in management and finance is qualified by knowledge, skill, experience, training, and education. (*See* R. 383-1, p. 5.) Additionally, none of the Objecting Counter-Defendants disputes the methodology used in Brayer's report. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists.").

### II. Relevance

Objecting Counter-Defendants instead challenge the relevance of Brayer's report, claiming that the report consists primarily of legal opinions. Brayer's report is divided into eleven bolded and

---

[1] Although Waukegan argues that the proper time to challenge an expert's opinions is during trial through cross examination, the Court may consider the admissibility of expert testimony before trial as part of its "screening" or "gatekeeping" role. *See Daubert,* 509 U.S. at 592, 596-97. Waukegan has not cited any authority indicating that a Court must wait until trial to decide whether to admit expert testimony, instead relying a non-precedential decision stating that "the appropriate time to attack the *accuracy* of an opposing expert's opinion is a trial." *See Harbor Ins. v. Continental Bank Corp.*, 85-7081, 1991 WL 222260, at *6 (N.D. Ill. Oct. 25, 1991, Judge Suzanne B. Conlon). Unlike in *Harbor*, Objecting Counter-Defendants do not challenge the accuracy of Brayer's conclusions, but instead dispute the relevance and admissibility of his conclusions. The Court may appropriately determine the admissibility of Brayer's opinions at this juncture as part of its gate-keeping function. *See, e.g.*, *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) (rejecting a similar argument that the Court should wait to address the propriety of legal conclusions in an expert's report until trial).

4

numbered headings, with "policy analysis" and "comments" below. Each Objecting Counter-Defendant moves to strike Brayer's opinions about whether there is coverage under its policy or whether it has certain duties under that policy. "Testimony is relevant if it helps the trier of fact in understanding the evidence or in determining a *fact* at issue." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002) (emphasis added). "Under Illinois law, the interpretation of an insurance policy is a question of law." *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008). Although experts may provide opinions as to the ultimate factual issues in a case, *U.S. v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009), they may not testify "as to legal conclusions that will determine the outcome of the case" under Rule 702. *Good Shepard Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions); *see also, e.g.*, *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) ("Expert testimony as to legal conclusions that will determine the outcome of a case is inadmissible.").

In arguing that Brayer's report does not contain inadmissible legal opinions, Waukegan primarily relies on case-law allowing experts to testify upon ultimate issues of fact, without citing any case permitting an expert to opine as to what an insurance policy covers or an insurer's legal duties under that policy.[2] Because the Court finds that many of Brayer's statements are legal opinions that are not helpful to the trier of fact, it strikes those opinions from Waukegan's Rule 26(a)(2)(A) Disclosures and bars testimony as to those opinions at trial. The Court addresses the specific legal conclusions related to each Objecting Counter-Defendant in turn.

---

[2] Indeed, the primary case relied on by Waukegan to support its argument that Brayer's opinions do not constitute legal conclusions, Magistrate Judge Cole's opinion in *Richman v. Shehan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006), held that legal conclusions, or opinions using "terms that have a separate, distinct, and specialized meaning in the law," "must be stricken and the experts precluded from testifying about them." *Id.* at 932.

**A. Interstate**

The four specific opinions in Brayer's report to which Interstate objects in its Motion to Strike Waukegan's Supplemental Rule 26(a)(2)(A) disclosure are:

1) While the Interstate insuring agreement appears to cover only occurrences during the policy period, the insuring agreement is modified by the Police Professional Liability Form Endorsement ("PPL endorsement"). (R. 383-1, p. 22.)

2) The PPL endorsement "follows form" over the American Safety Law Enforcement Liability coverage ("LEL"), which is not limited to occurrences during the policy period. (R. 383-1, p. 23.)

3) If American Safety had settled with Dominguez for its policy limits prior to or during trial, Interstate would have a duty to assume the defense of the City of Waukegan based on the policy definition of "loss." (R. 383-1, p. 23.)

4) Interstate did not fulfill its duties to Waukegan after receipt of notice of the *Dominguez* claim up to and after the trial. Although Interstate had no duty to defend until the underlying American Safety policy was exhausted, Interstate had a duty to interpret its own policy correctly and not attempt to mislead the City of Waukegan by failing to address the PPL endorsement in Terry Donahoe's denial letter dated October 20, 2006. (R. 383-1, p. 31.)

Each of these opinions addresses the limitations of coverage according to the terms of Interstate's insurance contract. More specifically, the first two opinions explain how certain parts of the contract are modified by other parts. These opinions usurp the Court's role in interpreting the language contained in the PPL endorsement and LEL. Because "[a]rgument about the meaning of . . . contracts . . . belong in briefs, not in 'expert's reports," *RLJCS Enters., Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007), the Court strikes these conclusions and bars Brayer from proffering these opinions at trial. Brayer's third and fourth opinions offer conclusions about Interstate's duties under the law. Because experts "may not testify as to the legal implications of conduct," and "[m]erely telling the jury what result

to reach is not helpful to the jury," *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990), the Court strikes Brayer's third and fourth opinions and bars his testimony with respect to them. *See id.* (finding that the district court abused its discretion by allowing an expert to testify about the scope of the insurer's duty under an insurance policy).

Westport (formerly "Coregis") also moves to strike Brayer's report and bar Brayer's testimony concerning the following opinions about Westport in his report:

1) The arrest of Dominguez; the trial of Dominguez; the requirement that Dominguez register as a sex offender; Dominguez's arrest and conviction for attempted failure to register as a sex offender; Dominguez's arrest by the U.S. Immigration and Naturalization Service; the alleged malicious prosecution and due process violations were each bodily injuries, personal injuries, occurrences or triggering events that would have engaged coverage under the Law Enforcement Liability ("LEL") insurance policies in effect at the time of the events. (R. 383-1, p. 15.)

2) The Coregis primary policies provide coverage to Waukegan and its police officers with respect to the *Dominguez* claim and the jury verdict resulting therefrom. (R. 383-1, pp. 23-24.)

3) The Coregis umbrella policies provide coverage to Waukegan and its police officers with respect to the *Dominguez* claim to the extent that "occurrences" qualifying for coverage on the corresponding Coregis underlying policies also qualified as covered "occurrences" on one or more umbrellas. (R. 383-1, p. 26.)

4) Coregis did not fulfill its duties under its policies after receipt of notice of the Dominguez claim up to and after trial. Coregis denied coverage unjustifiably, may not have policy defenses with respect to their exposure regarding the *Dominguez* claim, violated Illinois law with respect to claim handling. As a consequence, it is reasonable to conclude that Coregis acted in a vexatious and unreasonable manner in the way they addressed the *Dominguez* claim. (R. 383-1, pp. 31-32.)

5) Based on the reasons provided above and the import of the *Employers Insurance of Wausau v. Ehlco Liquidating Trust, et. al.* case in Illinois, because of Coregis' failure to deny coverage on a timely basis, it likely has *no* policy defenses because it is estopped from raising them. (R. 383-1, p. 34.)

The first conclusion contested by Westport interprets the meaning of "occurrence," "bodily injury," and "personal injury" in the Coregis policies in order to show that Westport was incorrect to deny

7

coverage on the ground that no bodily injury occurred in the course of Waukegan's Law Enforcement Activities. Brayer's second and third opinions then make broad conclusions about the coverage of the Coregis policies. His final two opinions address Westport's legal duties and the legal defenses available to it, even citing to a legal opinion to support the conclusion that the Coregis policies provide coverage. Each of these opinions "merely tell[s] the [trier of fact] what result to reach" with regard to Westport's liability, and therefore is "not admissible." *Montgomery*, 898 F.2d at 1541.[3] Indeed, "[t]he district court must limit expert testimony so as not to allow experts to opine on 'what the law required' or 'testify as to the governing law,'" which Brayer does in each of these opinions by concluding as to the scope of policies under the law and Westport's duties and defenses under the law. *See, e.g.*, *Holman Enters. v. Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008). Like in *Holman*, where the court held that an expert's opinion that the insurer did not act in bad faith was "an obvious conclusion of law inappropriate for an expert report," Brayer's opinion that Westport acted in a "vexatious and unreasonable manner" is particularly inappropriate. *Id.* Thus, the Court strikes these five legal conclusions from Brayer's report, and bars his testimony pertaining to them.

American Safety, although not as specific about the specific opinions to which it objects, moves to strike Brayer's report in its entirety because it renders conclusions on legal issues. The Court finds the following conclusions in Brayer's report pertaining to American Safety to comprise improper legal opinions: 1) "the American Safety Polic[ies] . . . respectively provide coverage to Waukegan and its police officers with respect to the Dominguez claim and the jury verdict resulting therefrom" (R. 383-1, p. 16); 2) "[c]learly American Safety had a duty to defend" (R 383-1, p. 20);

---

[3] Because Brayer's first conclusion applies to all insurers who issued Law Enforcement Liability ("LEL") insurance policies, the Court strikes this conclusion insofar as it applies to each Objecting Co-Defendant.

3) "there is no concomitant duty of Waukegan to *ask* for a defense. It is the duty of the insurer to *provide* a defense or explain why there is no such duty under the circumstances in a reservation of rights or denial letter" (R. 383-1, p. 20); 4) "[s]ince Mr. Hendley was acting within the scope of his employment by Waukegan at the time of the allegations made by *Dominguez*, he is an insured under the Policy" (R. 383-1, p. 21); 5) Liability Exclusion 2 in American Safety's policy "would not apply in the context American Safety apparently wishes it did because coverage does apply for both Hendley and Waukegan in that Hendley was an employee operating in the scope of his employment and Waukegan is . . . responsible for the conduct of its employee" (R. 383-1, p. 21); 6) "American Safety failed to satisfy its duties under its insurance policies . . . it did not reserve its rights on a timely basis; did not offer a defense to Waukegan and its employees; denied coverage unjustifiably; finally denied coverage far too long after Waukegan's initial notification of the claim; did not seek a declaratory judgment in a timely manner; violated Illinois law with respect to claim handling; and may have no policy defenses." (R. 383-1, p. 28); and 7) American Safety "acted in a vexatious and unreasonable manner with respect to the way they addressed the *Dominguez* claim" (R. 383-1, pp. 28, 37); and 8) American Safety "likely has no policy defenses because it is estopped from raising them" (R. 383-1, p. 31).

These opinions relating to the coverage of American Safety's insurance policies and its duties constitute "legal conclusions that will determine the outcome of the case." *Good Shepard*, 323 F.3d at 564. For Brayer to recite them at trial would usurp the role of the Court in determining whether there is coverage under American Safety's policies, and the role of the trier of fact in determining whether American Safety breached any contractual or legal duties and acted in bad faith. *See e.g.*, *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole*, No. 03-5238,

9

2006 WL 3782994, at *3 (N.D. Ill. Dec. 21, 2006, Judge Blanche M. Manning) (expert testimony not permitted if it will usurp the role of the trial judge, such that a report that looked "more like a litigant's submission to the court" was inadmissible); *Klaczak v. Consol. Med. Trans.*, 458 F. Supp. 2d 622, 636 (N.D. Ill. 2006) (expert may not testify on the issue of how a contract should be construed under the law).

Finally, Northfield and Certain Underwriters in their joint motion seek to strike Brayer's report and bar him from testifying as to what events trigger coverage under their policies (collectively the "London Policies"). They specifically challenge twenty-two opinions made with respect to them, many of which are repetitive of one another, and some of which merely recite facts without drawing specific legal conclusions. The Court strikes the following of those opinions as offering improper legal conclusions: 1) all of his conclusions regarding what triggered the definitions of "occurrence," "personal injury," and "bodily injury" and thus engaged the coverage of the insurance agreements (R. 383-1, pp. 15, 25, 34-35, 37); 2) "the Lloyds/Northfield policies . . . provide coverage to Waukegan and its police officers with respect to the *Dominguez* claim" (R. 383-1, p. 25); 3) "Underwriters are, in effect, responsible for the duties they have assigned to Willis, one [sic] of which is the duty to defend. In fact the policies expressly provide Lloyd's/Northfield with the right to take control of a claim." (R. 383-1, pp. 25-26); 4) Underwriters and Northfield "acted in a vexatious and unreasonable manner" with respect to the way they addressed the *Dominguez* claim (R. 383-1, pp. 34, 36, 37); 5) Underwriters and Northfield did not reserve their rights or file a declaratory judgment action in a timely way, denied coverage "unjustifiably" and belatedly without providing any defense, "violated Illinois law with respect to claim handling," and "may have no policy defenses" with respect to their exposures regarding the *Dominguez* claim (R.

10

383-1, pp. 34, 36, 37); 6) "Underwriters should be estopped from raising policy defenses" (R. 383-1, p. 35); 7) Northfield "owed coverage to Waukegan and its employees in the same manner and for the same reasons as did Underwriters" (R. 383-1, p. 35); and 8) Northfield and Certain Underwriters "had a duty to defend because their policies either provided coverage or potential coverage for the *Dominguez* claim" (R. 381-3, p. 37).

Again, "[l]egal opinion as to the operation of a contract under the relevant laws is not admissible," *Connell v. Steel Prods. Ltd.*, 2009 WL 691292, at *1 (N.D. Ill. 2009), because it is "a question of law, to be resolved by the Court," *Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994). *See also, e.g.*, *Paulissen v. U.S. Life Ins. Co. in the City of New York*, 205 F. Supp. 2d 1120, 1127 n. 8 (C.D. Cal. 2002) (the interpretation of an insurer's policy is a "legal, rather than factual" question that "must be determined by the Court"). Waukegan's arguments regarding coverage will be espoused by counsel for Waukegan at trial, just as Northfield and Certain Underwriters will provide their position on insurance coverage—this is not the province of an expert. Thus, the Court strikes the legal conclusions in Brayer's report relating to Northfield and Certain Underwriters listed above, and bars Brayer's testimony with respect to them.[4]

---

[4] Northfield and Certain Underwriters additionally argue that certain of Brayer's opinions are so speculative or qualified so as to be unhelpful to the trier of fact. Generally, "the contention that expert's opinion was speculative goes to the weight jurors might choose to accord his testimony," as opposed to the admissibility of that testimony. *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1405-1406 (7th Cir. 1991). Although many of Brayer's conclusions do use speculative phrasing, such as "to the extent that," "arguably," and "do not strike me as," the proper time for Northfield and Certain Underwriters to challenge the accuracy or level of certainty in Brayer's conclusions is at trial during cross-examination.

## CONCLUSION

For the reasons described above, Objecting Counter-Defendants' Motions to Strike Waukegan's Disclosures and to Bar Testimony of Brayer are granted in part and denied in part. The Court strikes and bars testimony pertaining only to the specific conclusions of law detailed above, and does not strike Brayer's report in its entirety. The Court notes that it will not necessarily admit those portions of the report that remain at trial or for any other purpose because Counter-Defendants may later challenge the testimony for reasons not raised in their current motions. Furthermore, because removal of portions of the disclosures may adversely affect their continuity, the Court grants Waukegan leave to file amended disclosures consistent with this order on or before March 1, 2010.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: