IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN SAFETY CASUALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) Case No. 07 C 1990 |
| v. | ) |
| CITY OF WAUKEGAN, | ) ) Judge Virginia M. Kendall |
| Defendant. | ) ) ) |
| CITY OF WAUKEGAN, | ) ) |
| Counter-Plaintiff, | ) ) ) |
| v. | ) ) |
| AMERICAN SAFETY CASUALTY INSURANCE COMPANY, INTERSTATE INDEMNITY COMPANY, CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, NORTHFIELD INSURANCE COMPANIES, WESTPORT INSURANCE CORPORATION, EVANSTON INSURANCE COMPANY, S. ALEJANDRO DOMINGUEZ, AND PAUL HENDLEY, | ) ) ) ) ) ) ) ) ) ) |
| Counter-Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff American Safety Casualty Insurance Company ("American Safety") filed a Complaint against the City of Waukegan ("Waukegan") on April 11, 2007, seeking a declaratory judgment that it does not owe coverage to Waukegan for its obligations in *S. Alejandro Dominguez v. Paul Hendley et. al.*, No. 04 C 2907 ("the Dominguez Civil Case"). On March 20, 2008, Waukegan filed a First Amended Counterclaim against Counter-Defendants American Safety,

Interstate Indemnity Company ("Interstate"), Certain Underwriters at Lloyds of London ("Underwriters"), Northfield Insurance Companies ("Northfield"), Westport Insurance Corporation ("Westport") (formerly Coregis Insurance Organizations), Evanston Insurance Company ("Evanston"), S. Alejandro Domiguez ("Dominguez"), and Paul Hendley ("Hendley"). American Safety, Northfield, Underwriters,[1] Westport, and Interstate (collectively "Objecting Counter-Defendants"), have filed four separate Motions to Strike the Amended Expert Report of Waukegan's Expert, Donald J. Brayer ("Brayer"). (*See* R. 527; R. 541; R. 544; R. 546; and R. 547, respectively.) For the reasons stated below, the Court grants in part and denies in part these motions, striking the portions of Brayer's report that contain improper legal conclusions and barring his testimony as to those conclusions at trial.

Objecting Counter-Defendants originally moved to strike Waukegan's Expert Report and bar any testimony on issues of law by Brayer, Waukegan's expert, on January 8, 2010. (*See* R. 390.) On February 9, 2010, the Court issued an order striking the portions of Brayer's report that contained improper legal conclusions and barring his testimony as to those conclusions at trial. (*See* R. 440 at 2.) The Court granted Waukegan leave to file an amended expert disclosure consistent with its order (*see* R. 440 at 12), and Objecting Counter-Defendants received Brayer's Amended Report on March 1, 2010. Objecting Counter-Defendants now move to strike Brayer's Amended Report in its entirety, arguing that the Report still consists of inadmissible legal conclusions.

**STANDARD OF REVIEW**

---

[1] On March 25, 2010, the Court granted Underwriters' oral motion to join in Northfield's Motion to Strike Waukegan's Amended Expert Report and Bar the Testimony of Donald Brayer. (*See* R. 544.)

The admissibility of scientific expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. The Court applies a three-step admissibility analysis for expert testimony under Rule 702 and *Daubert*. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id.* (quoting Fed. R. Evid. 702). Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert*, 509 U.S. at 592-93). The Court, however, is granted "broad latitude when it decides *how* to determine reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S 137, 142 (1999). Finally, the expert's testimony must be relevant, or "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Ervin*, 492 F.3d at 904.

## DISCUSSION

### I. Qualifications and Methodology

"A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists." *United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008). None of the Objecting Counter-Defendants challenges Brayer's expert qualifications, and this Court finds that a Chartered Property Casualty Underwriter, Registered Professional Liability Underwriter, Associate in Claims, Associate in Reinsurance, and Construction Risk Insurance Specialist with an MBA in management and finance is qualified by knowledge, skill, experience, training, and education. (*See*

R. 549 at 126-28.); *see also, e.g.*, *Fed. Ins. Co. v. Arthur Andersen, LLP*, No. 03-1174, 2006 WL 6555232, at *1-2 (N.D. Ill. Jan. 18, 2006) (St. Eve, J.) (denying a motion to exclude the expert report and testimony of Donald Brayer—the same expert at issue here—based on lack of qualifications and finding that his experience as a Federal claims adjuster gave him sufficient expertise to testify about the claims handling process). Additionally, none of the Objecting Counter-Defendants disputes the methodology used in Brayer's report.

**II.    Relevance**

As explained at greater length in this Court's February 9, 2010 Order, "[t]estimony is relevant if it helps the trier of fact in understanding the evidence or in determining a *fact* at issue." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002) (emphasis added). "Under Illinois law, the interpretation of an insurance policy is a question of law." *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008). Although experts may provide opinions as to the ultimate issues in a case, *U.S. v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009), they may not testify "as to legal conclusions that will determine the outcome of the case" under Rule 702. *Good Shepard Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions); *see also, e.g.*, *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) ("Expert testimony as to legal conclusions that will determine the outcome of a case is inadmissible.").

The first 16 pages of Brayer's Amended Report contain: a description of his qualifications; a list of documents he has reviewed; a "Chronological Recitation of Dates" involved in the case; the relevant policy language from each insurance policy at issue, and a new section entitled "Background—Customs and Standards for Claim Handling." These sections speak in general terms

4

and do not draw legal conclusions based on interpretation of the policies at issue. Specifically, the new "Customs and Standards for Claim Handling" section discusses principles employed by claim handlers and their liability claim handling process. Similarly, from the beginning of Brayer's "Coverage Analysis" section up until the sub-section on page 16 entitled "Policies at Issue," Brayer provides further detail about how a claims handler would go about determining coverage under an occurrence-based liability policy. The Court finds this information helpful to the trier of fact in understanding general principles that insurance claim handlers use in analyzing claims. *See Ervin*, 492 F.3d at 904 (an expert witness' testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue") (quoting Fed. R. Evid. 702); *see also, e.g.*, *Fed. Ins. Co.*, 2006 WL 6555232, at *3 (finding helpful to the jury "[e]vidence relating to the insurance industry's custom and practice of claims handling" but not testimony as to "ultimate issues").

In the subsequent section of Brayer's Amended Report entitled "Policies at Issue," however, he begins to engage in the same type of contract interpretation found in his original report. As Objecting Counter-Defendants note, he recites many of the same legal conclusions offered in the first report with respect to each carrier and policy, but couches them in third-person phrasing such as: "a reasonable and qualified claim handler should have recognized that." Indeed, the phrase "reasonable and qualified claims handler" appears at 54 least times in Brayer's Amended Report, often as a means of offering opinions about the legal obligations and duties owed under the policies in this case. (*See, e.g.*, R. 527, Ex. A at 17 ("a reasonable and qualified claims handler would observe that neither the definition of 'Self Insured Retention' in the [Coregis policies], nor the SIR Endorsement . . . modify the Duty to Defend provisions in Part II"); *id*. at 19 ("Therefore, a reasonable and qualified claim handler would have considered that there is no requirement under the policy that an

'occurrence' in the course of a 'Law Enforcement Activity' happen during the policy period."); *id*. at 20 ("A reasonable and qualified claim handler should have recognized that . . . the insuring agreement for Law Enforcement Liability does not restrict occurrences or offenses to those which occur during the policy period."); *id*. ("A reasonable and qualified claims handler should have noted that the term 'occurrence' may be ambiguously defined in the [Coregis policies]"); *id*. at 22 ("To the extent that American Safety [or Westport] may question whether coverage under its policy applies to officer Paul Hendley, a reasonable and qualified claim handler would likely conclude that it does."); *id*. at 24 ("A reasonable and qualified claims handler for Interstate would recognize that Interstate had no duty to defend unless the underlying American Safety policy was exhausted by payments of 'loss' arising from 'occurrences' to which the policy applied.").[2] Thus, the portion of Brayer's Amended Report between the "Policies at Issue" heading and the "Part II–Claim Handling" heading, consists solely of legal conclusions and a mere factual recitation of the policies at issue.

The intent of this Court's February 9, 2010 Order allowing Waukegan to file an Amended Expert Disclosure was not to grant Brayer leave to re-phrase the same legal conclusions or make new legal conclusions, but to allow him to parse out any relevant analysis remaining once those conclusions were eliminated. (*See* R. 440.) "Argument about the meaning of . . . contracts . . . belongs in briefs, not in 'expert's reports.'" *RJCLS Enters., Inc. v. Prof. Benefit Trust Multiple Employer Welfare Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007); *see also, e.g.*, *Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) (contract interpretation is "a

---

[2] Northfield's Motion to Strike, in which Underwriters joins, further details four examples of similar objectionable conclusions. (*See* R. 541, pp. 3-4.) Westport's, American Safety's, and Interstate's Motions to Strike likewise outline twelve, four, and six respective examples of these conclusions. (*See* R. 546 at 3-5; R. 527 at 3-4; R. 547 at 2-4.) Notably, many of the conclusions made in Brayer's report with respect to American Safety are adopted and applied to Westport because much of the language is the same in each. (*See* R. 549, Exhibit C at 26.)

question of law, to be resolved by the Court"); *Connell v. Steel Prods. Ltd.*, No. 04 C 194, 2009 WL 691292, at *1 (N.D. Ill. Mar. 16, 2009) (Kendall, J.) ("[l]egal opinion as to the operation of a contract under the relevant laws is not admissible"); *Paulissen v. U.S. Life Ins. Co. in the City of New York*, 205 F. Supp. 2d 1120, 1127 n.8 (C.D. Cal. 2002) (the interpretation of an insurer's policy is a "legal, rather than factual" question that "must be determined by the Court"). Brayer's analysis with regard to the carriers' policies and what a "reasonable claims handler" would conclude about coverage essentially duplicates the contract interpretation analysis that is the province of the Court in addressing the parties' Summary Judgment Motions. Indeed, the specific issues addressed by Brayer in this section—such as the insurers' duties to defend and fulfillment of that duty, whether coverage was triggered by the terms of the insuring policies, and what various terms in the policies mean—are contentious issues that determine the insurers' liability and will be discussed in detail in the Court's analysis of their Summary Judgment Motions. (*See* R. 527, Exhibit A at 16-28.)

In the section of the amended report entitled "Part II--Claim Handling" (beginning on page 28), however, Brayer turns from contract interpretation to an analysis of the procedures employed by each insurer's own claims handlers and the communications between those handlers and Waukegan. (*See* R. 527, Exhibit A, pp. 28-37.) Contrary to the Objecting Counter-Defendants' arguments, once stripped of opinions about ultimate issues set forth in the Court's February 9, 2010 Order, this analysis does not consist of inadmissible legal conclusions. Indeed, the primary case cited by Waukegan in arguing that an insurance expert's testimony does not invade the province of the Court addressed similar expert analysis of claims handling procedures for purposes of construing a bad faith claim—not the kind of policy interpretation engaged in throughout the middle section of Brayer's report. In *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004), the

7

court found admissible insurance expert testimony regarding a breach of good faith claim. *Id*. at 1016-17. The court explained that the expert could testify as to how "Defendants failed to comport with industry standards" and how those standards "supported a finding that [the insurers] acted in bad faith," as long as he did not "instruct[] the jury as to the applicable law" or make an ultimate conclusion that Defendants acted in bad faith. *See id*.; *see also, e.g.*, *Fed. Ins. Co.*, 2006 WL 6555232, at *3 (quoting *Primavera Famillenstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)) ("An expert may properly testify to the customs and standards of an industry and opine as to how a party's conduct measured up against such standards."); *Rickman v. Sheahan*, 415 F. Supp. 2d 929, 945 (N.D. Ill. 2006) ("There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the [opposing party's] performance in light of those standards.").

As explained above, pages 1 through 16 of Brayer's amended report permissively explain the general process of handling liability claims, and his application of those principles to the behavior of the insurance companies' handlers in pages 28 through 37 of his report is helpful to the trier of fact in evaluating the bad faith and breach of duty claims against the insurers. *See, e.g.*, *Fed. Ins. Co.*, 2006 WL 6555232, at *3 ("Evidence relating to the insurance industry's custom and practice of claims handing is squarely relevant to whether Federal breached its duty to defend, and expert testimony on this topic will help the jury in determining whether Federal breached that duty."); *Provident Life & Accident Ins. v. McCoy*, No. C-298-699, 2006 WL 5909027, * 16 (S.D. Ohio Feb. 1, 2006) (Smith, J.) (considering expert testimony about insurer's conduct in evaluating bad faith claim). Objecting Counter-Defendants take issue with the portions of the "Claims Handling" section that mention Illinois law, but "a witness may refer to the law in expressing an opinion without that

reference rendering the testimony inadmissible." *See Hangarter*, 373 F.3d at 1017 (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) (explaining that the expert "did not improperly usurp the court's role by instructing the jury as to the applicable law" even though his "testimony that Defendants departed from insurance industry norms relied in part on his understanding of the requirements of state law, specifically California's Unfair Settlement Claims Practice § 2695"). Although Brayer's "Claims Handling" section makes reference to Illinois law, including the Illinois Unfair Claims Law & Regulations, 215 ILCS § 154.6(c), and states that it guides claims handlers, like the expert in *Hangarter*, Brayer does not improperly make conclusions as to "the ultimate issue of bad faith." *See* 373 F.3d at 1017.

## CONCLUSION AND ORDER

For these reasons, the Court grants Objecting Counter-Defendants' Motion to Strike with respect to the sections of Brayer's Amended Report following the heading "Policies at Issue" on page 16 through the heading "Part II–Claims Handling" on page 28, and bars his testimony as to the analysis in these sections. Because Brayer did amend his initial report considerably to include the "Background—Customs and Standards for Claim Handling" and the beginning of the "Coverage Analysis" section, as well as omitting objectionable language from the "Claims Handling" section, it does not appear that Waukegan filed the Amended Report in bad faith, and the Court denies Objecting Counter-Defendants' requests for fees and costs incurred in bringing their motions.

_____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: January 12, 2011