PIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN SAFETY CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) | Case No. 07 C 1990 |
| v. | ) | |
| CITY OF WAUKEGAN, | ) ) | Judge Virginia M. Kendall |
| Defendant. | ) ) | |
| -------------------------------------------------------- | ) | |
| CITY OF WAUKEGAN, | ) ) | |
| Counter-Plaintiff, | ) ) | |
| v. | ) ) | |
| AMERICAN SAFETY CASUALTY INSURANCE COMPANY, INTERSTATE INDEMNITY COMPANY, CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, NORTHFIELD INSURANCE COMPANIES, WESTPORT INSURANCE CORPORATION, EVANSTON INSURANCE COMPANY, S. ALEJANDRO DOMINGUEZ, AND PAUL HENDLEY, | ) ) ) ) ) ) ) ) ) ) | |
| Counter-Defendants. | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This insurance coverage dispute between the City of Waukegan, Illinois ("Waukegan" or "the

City") and its various insurers arises from a $9,063,000 verdict entered against Waukegan in a civil

rights case brought by S. Alejandro Dominguez ("Dominguez"), who was convicted of rape in 1990

1

after an investigation by Waukegan police officers but exonerated by DNA evidence in 2002. The insurers issued to the City various primary and excess policies in effect between 1991 and 2006. The parties have filed summary judgment motions addressing whether the insurers should now indemnify Waukegan for its loss as a result of the Dominguez verdict, whether certain of Waukegan's carriers should have defended the City in the underlying case, and whether a subset of those insurers violated Section 155 of the Illinois Insurance Code by acting "unreasonably and vexatiously" in handling the Dominguez claim.

Plaintiff American Safety Casualty Insurance Company ("American Safety") filed a Complaint against Waukegan on April 11, 2007, seeking a declaratory judgment that it does not owe coverage to Waukegan for its obligations in *S. Alejandro Dominguez v. Paul Hendley et. al.*, No. 04 C 2907 (N.D. Ill.) ("the Dominguez Civil Case"). On August 19, 2009, Waukegan filed its operative complaint, the Second Amended Counterclaim (Doc. 273), against Counter-Defendants American Safety, Interstate Indemnity Company ("Interstate"), Certain Underwriters at Lloyds of London ("Underwriters"), Northfield Insurance Companies ("Northfield"), Westport Insurance Corporation ("Westport") (formerly Coregis Insurance Organizations), Dominguez, and Paul Hendley ("Hendley"). Two defendants, Scottsdale Insurance Company ("Scottsdale") and Evanston Insurance Company ("Evanston"), were named in Waukegan's first counterclaim, but the Court granted Scottsdale's motion for summary judgment in March 2009 (*see* Doc. 236) and Waukegan voluntarily dismissed Evanston without prejudice in July 2009 (*see* Doc. 260).

American Safety (Doc. 563) and Interstate (Doc. 561) have each filed Motions to Strike portions of Waukegan's Rule 56.1 statements of material facts in connection with its summary judgment motions. The Court addressed these motions during its analysis of the pending summary

judgment motions. For the reasons explained below, the Court grants in part and denies in part American Safety's motion, and grants Interstate's motion in its entirety.

In addition, American Safety (Doc. 444), Interstate (Doc. 448), and Westport (Doc. 460) have each filed motions for summary judgment against Waukegan, and Waukegan has cross-moved for summary judgment against each of them. (Docs. 458, 533 (amending 466), 539 (amending 476), respectively). Northfield and Underwriters have joined in three separate summary judgment motions, one addressing whether their policies were triggered (Doc. 450), one addressing their duty to defend Waukegan (Doc. 435), and the last addressing whether they had a duty to indemnify the City given its allegedly voluntary agreement to assume Hendley's liability (Doc. 429). Waukegan has cross-moved for summary judgment against Northfield and Underwriters separately (Docs. 535 (amending 491), 537 (amending 498), respectively).

For the reasons stated below, the Court:

1. grants in part American Safety's motion to strike portions of Waukegan's Local Rule 56.1 Statement supporting its motion for summary judgment against American Safety, as detailed below;

2. grants in its entirety Interstate's motion to strike portions of Waukegan's Local Rule 56.1 Statement supporting its motion for summary judgment against Interstate;

3. denies American Safety's motion for summary judgment against Waukegan in its entirety, and grants Waukegan's cross-motion for summary judgment as detailed below, finding American Safety (a) breached its duty to defend Waukegan, (b) must now indemnify Waukegan for the Dominguez verdict to the policy's limits, and (c) is liable under Section 155 of the Illinois Insurance Code for "unreasonable and vexatious" conduct in handling the Dominguez claim;

4. grants in part, and denies in part, Interstate's motion for summary judgment against Waukegan; and grants in part, and denies in part, Waukegan's cross-motion for summary judgment, finding that Interstate did not breach a duty to defend or violate Section 155, but must indemnify Waukegan for the Dominguez verdict;

5. grants in its entirety Northfield's and Underwriters' joint motion for summary judgment regarding whether their policies were triggered and denies Waukegan's cross-motions for summary judgment against Northfield and Underwriters, finding that the Northfield/Underwriters policies were not triggered by Dominguez's allegations in the underlying complaint, rendering moot Northfield's and Underwriters' joint motions for summary judgment regarding duty to defend and duty to indemnify;

6. grants in its entirety Westport's motion for summary judgment against Waukegan, and denies in its entirety Waukegan's motion for summary judgment against Westport, finding that the Westport policies were not triggered by Dominguez's allegations in the underlying complaint.

7. denies as moot Waukegan's objection (Doc. 781) to Magistrate Finnegan's Order of December 17, 2010 denying Waukegan's motion to compel.

## I.    MOTIONS TO STRIKE PORTIONS OF WAUKEGAN'S 56.1 STATEMENTS

As an initial matter, American Safety and Interstate have each moved to strike portions of Waukegan's Local Rule 56.1 statements in the City's cross-motions for summary judgment against them, arguing that they contain improper legal conclusions, rely on portions of Donald Brayer's Amended Expert Report that have been stricken by the Court's January 12, 2011 order, fail to provide adequate citation to the record, or are immaterial.  Local Rule 56.1(a) provides that a party moving for summary judgment shall file a "statement of *material facts*" entitling it to judgment as

4

a matter of law, "including within each paragraph *specific* references to the affidavits, parts of the records, and supporting materials relied upon to support the facts set forth in that paragraph." *See* L.R. 56.1(a) (emphasis added). Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. "A district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). Further, "a district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

First, with respect to American Safety's and Interstate's objections to paragraphs that contain or consist of legal conclusions, a party may not include legal opinions or conclusions of law in its statement of facts in support of summary judgment. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("Local Rule 56.1 requires that statements of facts concerning summary judgment motions identify the evidence supporting a party's factual assertions. It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (finding a statement of material facts did not comply with Rule 56.1 because it failed to adequately cite the record and contained legal arguments).

The Court, therefore, strikes the following portions of Waukegan's statements of material facts because they address legal issues that are to be decided by this Court:

| Document | Statement Striken |
|---|---|
| Waukegan's Statement of Material Facts in support of its Motion for Summary Judgment against American Safety | The second and forth sentences of paragraph 34; the latter part of the second sentence of paragraph 54. |

| | |
|---|---|
| Waukegan's Statement of Additional Material Facts in Opposition to American Safety's Motion for Summary Judgment | The first clause of paragraph 7; paragraph 9; paragraph 13; and the first sentence of paragraph 24 |
| Waukegan's Statement of Material Facts in support of its Motion for Summary Judgment against Interstate | Paragraph 34; all but the first sentence of paragraph 36; all but the first sentence of paragraph 38; the first clause of paragraph 44; the last sentence of paragraph 45; paragraph 46; the last clause of paragraph 48 reading "Dominguez's claims . . . are covered claims under the Interstate policy."; and the first sentence of paragraph 50. |
| Waukegan's Statement of Additional Material Facts in Opposition to Interstate's Motion for Summary Judgment | Paragraphs 10-11; the first sentence of paragraph 14; the first clause of paragraph 15; paragraphs 18-19; the last sentence of paragraph 20; the first sentence of paragraph 22; and the first two sentences of paragraph 23. |

Each of these paragraphs contains or consists of legal conclusions regarding whether certain claims in the Dominguez Civil Case occurred or accrued within the policy periods, who qualifies as an insured under the policies, when an insured's duty to defend was triggered, and whether claims in the underlying complaint are "covered" under the policies - in other words, the primary issues to be decided in this case.

Turning to American Safety's and Interstates's objections to statements of fact that rely on Brayer's expert testimony, "to be considered in a motion for summary judgment, the testimony [by an expert] must be admissible." *See Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993). For that reason, the Court strikes the following portions of Waukegan's statements of material facts because they are supported solely by portions of Brayer's report that the Court struck in its January 12, 2011 order. *See e.g.*, *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th

Cir. 2003) (expert testimony on conclusions of law not admissible); *see also In re Ocean Bank*, 481, F. Supp. 2d 892, 898 (N.D. Ill. 2007) (St. Eve, J.) (same).

| Document | Statement Stricken |
|---|---|
| Waukegan's Statement of Material Facts in support of its Motion for Summary Judgment against American Safety | Paragraph 47 and paragraph 68. |
| Waukegan's Statement of Additional Material Facts in Opposition to American Safety's Motion for Summary Judgment | The second sentence of paragraph 2; and the second sentence of paragraph 19. |
| Waukegan's Statement of Material Facts in support of its Motion for Summary Judgment against Interstate | All but the first sentence of paragraph 42 and paragraph 43. |

Finally, the Court strikes various facts because they do not making specific reference to a relevant portion of the record to support the statements therein or are not supported by the cited record. *See* L.R. 56.1 (a party's statement of material facts in support of its motion for summary judgment "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph"). In Waukegan's 56.1 statement in support of its motion for summary judgment against American Safety, the Court strikes the last clause of paragraph 31 referring to various "provisions" without citing them specifically; the general statements about cooperation and notification of "all information" in paragraph 49; and the last statement in paragraph 72 that "[b]y its own admission, [American Safety] has no policies or procedures it followed with regard to processing claims," which is a conclusion not supported by the cited testimony. *See* L.R. 56.1(a).

The Court denies American Safety's motion to strike, however, with respect to the first sentence of paragraph 56, paragraphs 58-59, and paragraphs 69-70 in Waukegan's 56.1 statement. Contrary to American Safety's assertions, these factual statements are relevant to the Court's legal determinations regarding coverage in this matter, including whether American Safety's conduct was "unreasonable and vexatious" for purposes of Waukegan's claims under Section 155 of the Illinois Insurance Code. It also denies American Safety's motion to strike with respect to paragraph 71 in Waukegan's 56.1 statement, which cites to portions of Brayer's amended report describing a claim representative's duties that the Court found admissible in its January 12, 2011 order.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    <u>Statement of Material Undisputed Facts[1]</u>

---

[1] This statement lists the facts material to the Court's analysis. It does not list every undisputed fact that appears in the parties' Rule 56.1 statements of undisputed material facts. In the interests of brevity, where the response to one party's Rule 56.1 statement establishes an undisputed fact, the response to the cross-moving party's Rule 56.1 statement, establishing that same fact, is not cited. Throughout this opinion, the Court cites the parties' Rule 56.1 statements as follows:

1. American Safety's response to Waukegan's Statement of Facts in Support of its Motion for Summary Judgment against American Safety are abbreviated as (Waukegan v. American Safety 56.1 Resp. ¶ );
2. Waukegan's response to American Safety's Statement of Additional Facts Supporting the Denial of Waukegan's Motion for Summary Judgment against American Safety are abbreviated as (Waukegan v. American Safety 56.1 Resp. Add. Facts ¶ );
3. Waukegan's response to American Safety's Statement of Facts in Support of its Motion for Summary Judgment against Waukegan are abbreviated as (American Safety v. Waukegan 56.1 Resp. ¶ );
4. American Safety's response to Waukegan's Statement of Additional Facts Supporting the Denial of American Safety's Motion for Summary Judgment against Waukegan are abbreviated as (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ );
5. citations to Interstate's response to Waukegan's Statement of Facts in Support of its Motion for Summary Judgment against Interstate are abbreviated as (Waukegan v. Interstate 56.1 Resp. ¶ );
6. Waukegan's response to Interstate's Statement of Facts in Support of its Motion for Summary Judgment against Waukegan are abbreviated as (Interstate v. Waukegan 56.1 Resp. ¶ );
7. citations to Interstate's response to Waukegan's Statement of Additional Facts Supporting the Denial of Interstate's Motion for Summary Judgment against Waukegan are abbreviated as (Interstate v. Waukegan 56.1 Resp. Add. Facts ¶ );
8. Underwriters' response to Waukegan's Statement of Facts in Support of its Motion for Summary Judgment against Underwriters are abbreviated as (Waukegan v. Underwriters 56.1 Resp. ¶ );
9. Northfield's response to Waukegan's Statement of Facts in Support of its Motion for Summary Judgment against Northfield are abbreviated as (Waukegan v. Northfield 56.1 Resp. ¶ );
10. Waukegan's response to Northfield's and Underwriters' Statement of Facts in Support of their Motion for Summary Judgment against Waukegan on the Trigger Issue are abbreviated as (Underwriters &

## 1. The Parties.

Waukegan is a municipal corporation providing governance to residents within Lake County, Illinois. (Waukegan v. American Safety 56.1 Resp. ¶ 1; Interstate v. Waukegan 56.1 Resp. ¶ 1; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 1; Waukegan v. Westport 56.1 Resp. ¶ 1.) Plaintiff and Counter-Defendant American Safety issued insurance policies to Waukegan that are at issue in this matter, as did Counter-Defendants Interstate, Westport, Underwriters, and Northfield. (Waukegan v. American Safety 56.1 Resp. ¶ 2; Waukegan v. Interstate 56.1 Resp. ¶ 2; Underwriters & Northfield Trigger Resp. ¶¶ 24-25; Waukegan v. Westport 56.1 Resp. ¶ 2.) Counter-Defendant Interstate provides insurance coverage policies to Illinois insureds. (Interstate v. Waukegan 56.1 Resp. ¶ 3.) Counter-Defendant Underwriters are members of syndicates who severally subscribed to certain insurance policies and are authorized to underwrite insurance policies in Illinois. (Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 2.) Counter-Defendant Northfield is a Minnesota insurance company that provides insurance policies to Illinois insureds. (Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 3.) Counter-Defendant Westport is an insurance company licensed to do business in the state of Illinois. (Westport v. Waukegan 56.1 Resp. ¶ 1.) Counter-

Northfield Trigger Issue 56.1 Resp. ¶ );

11.  Underwriters' and Northfield's response to Waukegan's Statement of Additional Facts Supporting the Denial of their Motion for Summary Judgment against Waukegan on the Trigger Issue are abbreviated as (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ );

12.  Westport's response to Waukegan's Statement of Facts in Support of its Motion for Summary Judgment against Westport are abbreviated as (Waukegan v. Westport 56.1 Resp. ¶ );

13.  Waukegan's response to Westport's Statement of Additional Facts Supporting the Denial of Waukegan's Motion for Summary Judgment against Westport are abbreviated as (Waukegan v. Westport 56.1 Resp. Add. Facts¶ );

14.  Waukegan's response to Westport's Statement of Facts in Support of its Motion for Summary Judgment against Waukegan are abbreviated as (Westport v. Waukegan 56.1 Resp. ¶ );

15.  Westport's response to Waukegan's Statement of Additional Facts Supporting the Denial of Westport's Motion for Summary Judgment against Waukegan are abbreviated as (Westport v. Waukegan 56.1 Resp. Add. Facts ¶ ).

Defendant Dominguez is a resident of Illinois who was tried and convicted for home invasion and sexual assault in 1990 but later exonerated.   (Waukegan v. American Safety 56.1 Resp. ¶¶ 4-5.) Counter-Defendant Hendley is a former Waukegan police sergeant involved in the investigation of the home invasion and sexual assault for which Dominguez was convicted. (Waukegan v. American Safety 56.1 Resp. ¶ 7; Waukegan v. Interstate 56.1 Resp. ¶ 7; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 15; Waukegan v. Westport 56.1 Resp. ¶ 6.)  At all times relevant to the allegations in Dominguez's federal court complaint following his exoneration, Hendley was a Waukegan employee engaged in law enforcement activities, as directed and controlled by Waukegan. (Waukegan v. American Safety 56.1 Resp. ¶ 8; Waukegan v. Interstate 56.1 Resp. ¶ 7[2].)

### 2.      Dominguez's Civil Case (the Underlying Complaint).

On April 23, 2004, Dominguez then filed suit against Waukegan, Hendley, Waukegan Police Detective John Moran ("Moran"), Lisa Kraus ("Kraus"), and others in the United States District Court for the Northern District of Illinois, alleging false arrest and false imprisonment, malicious prosecution under 42 U.S.C. Section 1983 ("Section 1983"), and unconstitutional policies and procedures (the "Dominguez Civil Case").  (Waukegan v. American Safety 56.1 Resp. ¶¶ 6, 26; Interstate v. Waukegan 56.1 Resp. ¶¶ 6, 16; Waukegan v. Interstate 56.1 Resp. ¶¶ 6, 23-24; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶¶ 6, 17; Waukegan v. Westport 56.1 Resp. ¶ 5; Waukegan v. Westport 56.1 Resp. ¶ 24.)  Dominguez filed his operative complaint on August 2,

---

[2] Interstate denies that the citations to the Hendley deposition support the City's statements that Hendley was an employee engaged in law enforcement activities at all times relevant to the Dominguez suit.  (Waukegan v. Interstate 56.1 Resp. ¶ 7.)  That deposition states, in relevant part, that Hendley was a sworn police officer for the City between 1971 and 1994, and was a sergeant during the time of the Dominguez investigation.  (Waukegan v. Interstate 56.1 Exhibit 5.) Further, Interstate does not cite the record to support its denial of this fact statement, and it is deemed admitted.   *See* L.R. 56.1(b)(3)(B) (requiring "in the case of any disagreement," with the moving party's statement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon.")  Further, in its answer to the operative complaint, Interstate admitted that Hendley was a police officer and involved in the investigation of Dominguez.  (*See* Doc. 312 ¶ 8.)

2004 against Waukegan, Hendley, Moran, Kraus, and security guard Richard McCandless ("McCandless"), alleging federal claims for false arrest and false imprisonment (Count I), a violation of the Due Process Clause through malicious prosecution pursuant to Section 1983 (Count II), claims against Kraus and McCandless for conspiracy pursuant to Section 1983 (Count III), state law malicious prosecution against Kraus and McCandless (Count IV), state law intentional infliction of emotional distress (Count V), respondeat superior (Count VI), and indemnification (Count VII) ("the Underlying Complaint").  (Waukegan v. American Safety 56.1 Resp. ¶ 27; Interstate v. Waukegan 56.1 Resp. ¶ 6; Waukegan v. Interstate 56.1 Resp. ¶¶ 23, 25; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶¶ 6, 18; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 3; Waukegan v. Westport 56.1 Resp. ¶ 24, 26.)  These constitute personal injury claims for offenses caused in the course of Waukegan's law enforcement activities. (Waukegan v. American Safety 56.1 Resp. ¶ 15; Waukegan v. Interstate 56.1 Resp. ¶ 13[3].)

a.      **The Factual Allegations in the Underlying Complaint.**

The Underlying Complaint made the following factual allegations.  First, it alleged that on September 19, 1989, Lisa Kraus ("Kraus") filed a complaint with the Waukegan Police Department asserting that she was sexually assaulted in her apartment.  (Waukegan v. American Safety 56.1 Resp. ¶ 15; Waukegan v. Interstate 56.1 Resp. ¶ 13; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 7; Waukegan v. Westport 56.1 Resp. ¶ 14.)  Waukegan police officers Hendley and Moran conducted an investigation into these allegations.  (Waukegan v. American Safety 56.1 Resp. ¶ 16; Interstate v. Waukegan 56.1 Resp. ¶ 8; Waukegan v. Westport 56.1 Resp. ¶ 15.)  On September 21,

---

[3]Interstate "objects" to the City's statement that the Underlying Complaint alleged personal injuries cause by offenses in the course of the City's law enforcement activities, citing the Underlying Complaint itself.  (Waukegan v. Interstate 56.1 Resp. ¶13.)  Interstate cites nothing that refutes the City's statement, and it is clear that the Underlying Complaint alleges personal injuries that occurred in the course of law enforcement activities.

1989, the Underlying Complaint alleged, Hendley arrived at Kraus's apartment building for investigation purposes and spoke with a security guard. (American Safety v. Waukegan 56.1 Resp. ¶ 7; Waukegan v. Interstate 56.1 Resp. ¶ 14; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 8.) Although Hendley denied the following allegations in his answer to the Underlying Complaint, that complaint alleged that Hendley asked the security guard to bring Dominguez into the guard's office for Kraus to identify him, and that Kraus then identified Dominguez as her assailant in that office. (American Safety v. Waukegan 56.1 Resp. ¶¶ 8, 10.)

It further alleges that Dominguez was arrested on September 21, 1989 and convicted on February 28, 1990 of aggravated criminal sexual assault and home invasion; he was sentenced to a nine year term, but then released for good behavior in December 1993 and required to register as a sex offender for ten years. (Waukegan v. American Safety 56.1 Resp. ¶¶ 4, 18-19; American Safety v. Waukegan 56.1 Resp. ¶ 12; Interstate v. Waukegan 56.1 Resp. ¶¶ 10-12; Waukegan v. Interstate 56.1 Resp. ¶¶ 15-17; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶¶ 9-11; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 19; Waukegan v. Westport 56.1 Resp. ¶¶ 17-18.) When he missed the sex offender registration deadline in November 1998, he was arrested and held in jail for one day. (Waukegan v. American Safety 56.1 Resp. ¶ 20; Interstate v. Waukegan 56.1 Resp. ¶ 13; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶¶ 12-13; Waukegan v. Westport 56.1 Resp. ¶ 19) He then pled guilty to attempted failure to register as a sex offender and was sentenced to two years of probation and 100 hours of community service; he was also required to participate in therapy sessions. (Waukegan v. American Safety 56.1 Resp. ¶ 21; Waukegan v. Interstate 56.1 Resp. ¶ 19; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 14; Waukegan v. Westport 56.1 Resp. ¶ 20.)

On January 28, 2001, Immigration and Naturalization Services ("INS") arrested Dominguez, a non-citizen, and initiated proceedings for his immediate removal from the country based on his earlier sexual assault conviction. (Waukegan v. American Safety 56.1 Resp. ¶ 35; American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 15.) He remained in INS custody for a one month period between January 28, 2001 and February 28, 2001. (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 15.) On August 10, 2001, the Underlying Complaint alleges, Dominguez was granted post-conviction DNA testing; the results of this test excluded Mr. Dominguez as the alleged rapist. (American Safety v. Waukegan 56.1 Resp. ¶ 17; Interstate v. Waukegan 56.1 Resp. ¶ 14; Waukegan v. Interstate 56.1 Resp. ¶ 21; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 15; Waukegan v. Westport 56.1 Resp. ¶ 21.) On April 26, 2002, the Circuit Court of the Nineteenth Judicial Circuit for Lake County, Illinois reversed Dominguez's convictions for home invasion, aggravated criminal sexual assault, and exonerated him. (Waukegan v. American Safety 56.1 Resp. ¶ 5; Waukegan v. Interstate 56.1 Resp. ¶ 5; Waukegan v. Westport 56.1 Resp. ¶¶ 22-23.)

### b.    The Dominguez Verdict and Post-Trial Proceedings.

The district court later dismissed Counts III, IV, and V – the Counts against Kraus and the security guard individually. (American Safety v. Waukegan 56.1 Resp. ¶ 20.) On October 13, 2006, the district court entered a minute order stating: "[i]n accordance with this Court's oral ruling the City of Waukegan is hereby dismissed as a defendant." (Interstate v. Waukegan 56.1 Resp. ¶ 17; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 19.) That order stated:

> the ruling was based on the lack of proof as to City in terms of the substantive Section 1983 claims of plaintiff S. Alejandro Dominguez . . . , but with the express understanding, based on the representations of counsel for all parties, that the City had unconditionally undertaken to indemnify codefendant Paul Hendley. . . for any awards of compensatory damages and attorneys' fees entered against him.

(American Safety v. Waukegan 56.1 Resp. ¶ 40; American Safety v. Waukegan 56.1 Ex. Q.) Through this order, the Court ordered Waukegan to be held liable as indemnitor for all sums that Hendley was obligated to pay in the litigation. (Waukegan v. American Safety 56.1 Resp. ¶ 29.)

The district court conducted a jury trial beginning on October 3, 2006, and the jury returned a verdict in favor of Dominguez in the amount of $9,063,000 in compensatory damages on October 17, 2006. (Waukegan v. American Safety 56.1 Resp. ¶¶ 6, 28; Interstate v. Waukegan 56.1 Resp. ¶ 18; Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 20; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 22; Waukegan v. Westport 56.1 Resp. ¶¶ 27, 59.) Dominguez had withdrawn all punitive damages claims before the close of the trial. (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 23; Waukegan v. Westport 56.1 Resp. ¶ 27.) On October 27, 2006, Hendley moved for judgement as a matter of law and for a new trial, which the district court denied on December 4, 2006. (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 24.)

On December 13, 2006, the district court entered a judgment order vacating the prior dismissal of Waukegan as a defendant based on its binding admissions that it would indemnify Hendley for all compensatory damages and attorney's fees for which he was held liable. (Interstate v. Waukegan 56.1 Resp. ¶ 19; Waukegan v. Interstate 56.1 Resp. ¶ 28; Waukegan v. Westport 56.1 Resp. ¶ 28.) The order specifically explained that the City would be "held liable as indemnitor for all sums that Hendley is obligated to pay" and that the "City is further ordered to be jointly and severally liable with Hendley as to all such sums, and a judgment shall be entered against it in accordance with this judgment order." (Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 21.) Waukegan has since satisfied the judgment award, including the judgment, interest, and attorneys' fees, in a total amount of $11,397,195.39. (Waukegan v. American Safety 56.1 Resp. ¶ 30;

Waukegan v. Interstate 56.1 Resp. ¶ 29; Waukegan v. Westport 56.1 Resp. ¶ 29.)  Waukegan also incurred at least $1,079,296.90 in its own attorneys fees in defending Hendley in the Dominguez Civil Case and the appeal.  (Waukegan v. American Safety 56.1 Resp. ¶ 30; Waukegan v. Interstate 56.1 Resp. ¶ 29.)

On December 29, 2006, Waukegan filed a notice of appeal to the United States Court of Appeals for the Seventh Circuit from the jury verdict in the Dominguez Civil Case.  (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 25.)  The Seventh Circuit affirmed the judgment of the District Court on September 30, 2008 and issued its mandate on November 12, 2008. (American Safety v. Waukegan 56.1 Resp. ¶ 23; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 26.)  On January 29, 2009, Waukegan and Hendley petitioned the Supreme Court for certiorari, which the Supreme Court denied on May 19, 2009.  (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 27.)

### 3.     The Insurance Policies at Issue.

#### a.     The Policy Periods Summarized.

Northfield and Certain Underwriters issued Law Enforcement Liability insurance policies to Waukegan that were in effect, for the purposes of this suit, between November 1, 1991 and November 1, 1995.  (Underwriters & Northfield Trigger 56.1 Resp. ¶¶ 24-25.)  Westport issued primary and umbrella policies to Waukegan effective between November 1, 1997 and November 1, 2000. (Westport v. Waukegan ¶¶ 17-19, 30-32.)  American Safety issued two policies to Waukegan, effective November 1, 2000 through November 1, 2001 and November 1, 2001 through November 1, 2002. (Waukegan v. American Safety ¶ 31.)  Finally, Interstate issued a Commercial Umbrella

Policy to Waukegan covering excess over American Safety's November 1, 2001 through November 1, 2002 insurance policy.  (Interstate v. Waukegan ¶¶ 21-22.)

**b.**  **American Safety's Policies.**

American Safety issued two Comprehensive Law Enforcement Liability Policies to Waukegan ("American Safety's Policies").  (Waukegan v. American Safety 56.1 Resp. ¶ 31.)  The first was Public Entity Program Policy No. 14AN-MUOO-0000008-001 to Waukegan, effective between November 1, 2000 and November 1, 2001, and the second was Public Entity Program Policy No. 14AN-MUOO-0000008-002, effective between November 1, 2001 and November 1, 2002.  (Waukegan v. American Safety 56.1 Resp. ¶ 31.)   Each of the American Safety policies contains the following relevant provisions:

**General Liability**

We will pay all sums in excess of the "Self Insured Retention" limit stated in the Policy Declarations that any "Insured" becomes legally obligated to pay as damages because of "Bodily Injury" or "Property Damage" caused by an "Occurrence", or "Advertising Injury" or "Personal Injury" caused by an offense to which this coverage applies.  The amount we will pay in damages is limited as described in section 2b below.  The above stated coverage applies only if the "Occurrence" or offense occurs during the policy period and within the Policy Territory as set forth in the General Policy Provisions. The amount we will pay in damages is limited as described in Section 2b below. The above stated coverage applies only if the "Occurrence" or offense occurs during the policy period and within the Policy Territory as set forth in the General Policy Provisions. This General Liability Coverage Part does not apply if the "Occurrence" or offense arises as a result of a "Law Enforcement Activity".

**Law Enforcement Liability**

We will pay all sums in excess of the "Self Insured Retention" limit stated in the Policy Declarations that any "Insured" becomes legally obligated to pay as damages because of "Bodily Injury" or "Property Damage" caused by an "Occurrence" in the course of a "Law Enforcement Activity" or because of an "Advertising Injury" or "Personal Injury" caused by an offense in the course of your "Law Enforcement Activity."

**Duty to Defend**

We shall have the right and duty to select counsel and defend any claims seeking damages to which Part II applies. Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements. . . .

*     *     *

**Liability Exclusions** . . .

This insurance does not apply to any claim due to: . . .

>2. Assumption of Liability: Damages any "Insured" is obligated to pay by reason of the assumption of liability under a contract or agreement. This exclusion does not apply to liability for damages assumed in a contract or agreement that is an "Insured Contract" provided "Bodily Injury", "Property Damage", "Personal injury" and/or "Advertising Injury" occur subsequent to the execution of the contract or agreement. . . .

*     *     *

**Supplementary Payments**

In addition to the Limit of Insurance we will pay for the "Insured": (5) All costs taxed against the "Insured" in the "Suit"; (6) Prejudgment interest awarded against the "Insured" on that part of the judgment we pay . . . (7) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in the court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**Common Policy Conditions** . . .

**12. An "Insured's" Duties in the Event of an "Occurrence," Claim or Suit**...
Unless having our express written consent, or acting at their own cost, an "Insured" will not voluntarily: 1. Make a payment; 2. Assume any obligation; or 3. Incur any expense . . . .

**24. Policy Period**
We will pay only for loss that you sustain occurring during the Policy Period shown in the Declarations of this policy.

**Common Policy Definitions** . . .

**9. "Bodily Injury"** means bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation sustained by a person, including death resulting from any of these at any time. . . .

**19. "Insured"** means (a) You . . . (d) Any "Employee" or any other person for whom the "Insured" is legally liable provided that, at the time of the "Occurrence" or wrongful act, the individual or individuals are under the direct supervision or control of an "Insured." . . . (f)Your "Employee" is an "Insured" for: 1) "Bodily Injury" or "Personal Injury" to you or to a co-employee while in any way connected or related to the course and scope of his or her employment, or the spouse, child, parent, brother or sister of that co-employee as a consequence of such "Bodily Injury" or "Personal Injury," or for any obligation to share damages with or repay someone else who must pay damages because of the injury; or 2) "Property Damage" to property owned or occupied by or rented or loaned to that "Employee", or any of your other "Employees". . .

**21. "Law Enforcement Activity"** means all operations of your police force or any other public safety organization which enforces the law and protects persons or property. . . .

**29. "Occurrence"** means an accident caused by a "Covered Cause of Loss", including continuous or repeated exposure to substantially the same general harmful conditions."

**30. "Personal Injury"** means injury, other than "Bodily Injury", arising out of one or more of the following offenses: (a) False arrest, detention or imprisonment; (b) Malicious prosecution; . . . (g) Violation of the Federal Civil Rights Act of 1871or 42 U.S.C. 1983 and similar laws.

**38. "Self Insured Retention"** means: that sum or sums indicated in the Declarations or Schedule of "Self Insured Retentions" which the "Insured" shall pay: (a) For settlement or satisfaction of claims, "Suits" of judgments, after making deductions for all salvages and recoveries; plus (b) "Allocated Claims Expenses" . . . . The "Self Insured Retention" shall be paid by the "Insured" prior to any obligation on the part of this Company. This "Self Insured Retention" shall be funded by an "annual Aggregate Loss Fund" administrated by a "Third Party Administrator."

(American Safety v. Waukegan 56.1 Resp. ¶¶ 26, 43; American Safety v. Waukegan 56.1, Exhibits

B and C to Ex. A; Waukegan v. American Safety 56.1 Resp. ¶¶ 38-41, 44-45; Waukegan v.

American Safety 56.1 Resp. Add. Facts. ¶¶ 1, 4; American Safety v. Waukegan 56.1 Resp. Add.

Facts ¶¶ 2, 3, 11, 17, 20; Waukegan v. Interstate 56.1 Resp. ¶¶ 44, 47; Interstate v. Waukegan 56.1 Resp. Add. Facts ¶¶ 14, 16.)

The first American Safety policy lists the "Policy Period" as "From: 11/01/00 To: 11/01/01." (Waukegan v. American Safety 56.1 Resp. Add. Facts. ¶ 2.) The second American Safety policy lists the "Policy Period" as "From: 11/01/01 To: 11/01/02." (Waukegan v. American Safety 56.1 Resp. Add. Facts. ¶ 2.) Dominguez's January 28, 2001 arrest and incarceration occurred during the policy period for the first American Safety policy, and his convictions for home invasion, sexual assault, and failure to register as a sex offender were vacated during the policy period for the second American Safety policy. (Waukegan v. American Safety 56.1 Resp. ¶ 35-36.) The policies included $1,000,000 limits for each person and occurrence for losses, including losses attributable to or occurring in the course of law enforcement activities. (Waukegan v. American Safety 56.1 Resp. ¶ 31.) Waukegan's police officers are insureds under the policies. (Waukegan v. American Safety 56.1 Resp. ¶ 38.) Under the American Safety Policies, Dominguez's claims of false arrest (Count I) and malicious prosecution (Count II) fall within the definition of "personal injury." (Waukegan v. American Safety 56.1 Resp. ¶ 42.) The Policies do not require insureds to notify American Safety when the SIR is exhausted.[4] (Waukegan v. American Safety 56.1 Resp. ¶ 46; American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 18.) American Safety never inquired whether the SIR was exhausted or requested "paid to date" figures to determine whether the SIR was exhausted. (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 18.)

---

[4] Waukegan and American Safety here dispute when the SIR was exhausted with respect to the Dominguez claim. Relying on Waukegan's third party insurance administrator's deposition testimony that the defense costs did not penetrate the SIR "until the trial," American Safety claims that the SIR was not exhausted until the date of Waukegan's counsel's bill for trial on November 1, 2006. (American Safety v. Waukegan 56.1 Resp. ¶ 35.) Waukegan counters that the SIR was exhausted on October 17, 2006–the date judgment entered in the trial. *See id.* However, because the Court finds the SIR did not have to be exhausted to trigger American Safety's duty to defend, the exact date the SIR was exhausted does not impact the Court's coverage analysis.

### b.  Interstate Policy.

Interstate issued to Waukegan Commercial Excess and Umbrella Policy number UMC6101226 ("the Interstate Policy"), which had a policy period of November 1, 2001 through November 1, 2002.  (Interstate v. Waukegan 56.1 Resp. ¶ 21, 24; Waukegan v. Interstate 56.1 Resp. ¶ 30.)  The policy includes a provision for an upper liability limit of $10,000,000 per occurrence.  (Waukegan v. Interstate 56.1 Resp. ¶ 30.)  It provides coverage that follows form of underlying policies listed in its Schedule of Underlying Insurance.  (Interstate v. Waukegan 56.1 Resp. ¶ 21.)  Specifically, the Interstate Policy was an excess policy over American Safety's policy effective November 1, 2001 through November 1, 2002.  (Interstate v. Waukegan 56.1 Resp. ¶ 22.)  The Interstate Policy provides coverage on an "occurrence" basis, and defines "insured" as "[t]he 'named insured'" or "[a]ny person or organization included as an insured in any 'underlying policy' at the inception of this policy, other than an Additional Insured." (Waukegan v. Interstate 56.1 Resp. ¶ 45.)  Interstate's policy provides that "[n]o 'insured' will, except at their own expense, voluntarily make a payment, assume any obligation or incur any expense without our consent."   (Interstate v. Waukegan 56.1 Resp. ¶ 25.)  Interstate's Policy has a SIR limit of zero dollars.  (Waukegan v. Interstate 56.1 Resp. ¶ 33.)

Under Section I, "Coverage," of Interstate's Policy, the section entitled "Coverage A - Excess Liability Coverage" states that:

> Insurance under Coverage A applies only to liability and damages covered by the 'underlying insurance' scheduled on this policy and is subject to the same terms, conditions, agreements, warranties, exclusions, definitions and limitations as the 'underlying policy' which are incorporated as part of this policy as applicable to Coverage A, except for: . . .
>
> 3. Any duty to investigate or defend, or to pay for any investigation or defense . . .

7. Any provision of the 'underlying policy' which is inconsistent with the provisions specifically set forth in this policy as applicable to Coverage A, in which case the provisions of this policy will apply; and

8. Any provision in this policy which is applicable to Coverage A for which a similar provision is not contained in the 'underlying policy,' in which case the provisions of this policy will apply.

We will pay on behalf of the 'insured' that part of 'loss' to which this insurance applies, in excess of the total applicable limits of 'underlying insurance' and any 'other insurance' that the 'insured' becomes legally obligated to pay as damages provided such damages are caused by an 'occurrence' during this Policy Period ....

(Waukegan v. Interstate 56.1 Resp. ¶ 39; Waukegan v. Interstate 56.1 Exhibit 10, p. 20.)

Under Section II, "Defense and Supplementary Payments," Interstate's Policy further states:

**Defense**

1. At Our Discretion, We May: (a) Investigate any 'occurrence,' claim or 'suit, and (b) Settle any claim of which we assume control of the settlement, or 'suit' of which we assume control of the defense. . .

3. We will assume control of the investigation and settlement of any claim, or defense of any 'suit' brought in the United States of America (including territories and possessions), Puerto Rico or Canada, against any 'insured' seeking damages to which this policy applies:

a. Under Coverage A, when the applicable limits of 'underlying insurance' and 'other insurance' have been exhausted by payments of 'loss,' or expenses if included within the limits of insurance, arising from 'occurrences' to which this policy applies . . .

(Waukegan v. Interstate 56.1 Resp. ¶ 39.)

Under Section V, "Limits of Insurance," "Limits of Insurance Applicable to Coverage A and Coverage B," Interstate's Policy states: "We will pay only that amount of the covered 'loss' that is in excess of: 1. Under Coverage A, the total applicable limits of the 'underlying policies' listed in the Schedule of Underlying Insurance and all 'other insurance'; . . . (Waukegan v. Interstate 56.1

Resp. ¶ 32; Waukegan v. Interstate 56.1 Exhibit 10, p. 26.) "Loss" is defined as "those sums actually paid in settlement of a claim or 'suit' in satisfaction of a judgment which the 'insured' is legally obligated to pay as damages because of a covered injury, damage or offense, after making proper deductions for all recoveries or salvage." (Waukegan v. Interstate 56.1 Resp. ¶ 45.) Under Section VII, Conditions, subsection J, the Policy further provides:

**When loss is payable**

This policy does not apply until: (1) Under Coverage A, any 'insured,' 'underlying insurance,' and/or 'other insurance' is obligated to pay the full amount of the 'underlying insurance' plus any applicable 'other insurance, . . .

(Waukegan v. Interstate 56.1 Resp. ¶ 32; Waukegan v. Interstate 56.1 Exhibit 10, p. 33.)

Interstate's Policy, finally, contains a "Police Professional Liability Following Form Endorsement" that states under "Exclusions Applicable to Coverage A . . .":

This insurance does not apply:

To any liability resulting from the operations or activities of any police department or any other law enforcement agency of any 'insured' including any agent or employees thereof, arising out of and including but not limited to:

   A. False arrest, detention, or imprisonment; . . .

This exclusion does not apply if such liability is covered by valid and collectible 'underlying insurance' for the full limits scheduled. The coverage afforded by this policy will be no broader than the coverage provided by the 'underlying insurance.'

(Waukegan v. Interstate 56.1 Resp. ¶¶ 41-42.)

### c.    Underwriters' and Northfield's Policies.

Underwriters subscribed to Public Entity All Lines Aggregate Insurance policies issued to Waukegan ("the Underwriters Policies") with the following coverage periods: (1) Underwriters' Policy No. 101104700 between November 1, 1991 and November 1, 1994; and (2) Underwriters'

Policy No. G712157, for which only the November 1, 1994 to November 1, 1995 term provided law enforcement liability coverage and is relevant purposes of this litigation. (Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 24; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 5.) Northfield issued Commercial Insurance Policies to Waukegan ("the Northfield Policies") with the following coverage periods: (1) Northfield Policy No. AA101050 between November 1, 1991 and November 1, 1994; and (2) Northfield Policy No. AA101117, for which only the November 1, 1994 to November 1, 1995 term provided law enforcement liability coverage and is relevant for purposes of this litigation. (Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 25; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 5.) Within the Underwriters' Policies, Underwriters and Northfield apportioned liability for these policies between themselves. (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 6.) Both Underwriters' Policies include provisions for $1,000,000 limits for each loss and/or occurrence and a $2,000,000 aggregate limit for losses including those attributable to law enforcement activities. (Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 7.)

Underwriters' Policies provide in relevant part as follows:

It is agreed that the unqualified word 'Assured' wherever used in this Insurance includes not only the Named Assured but also: 1. any official, trustee, Director, Officer, Partner, Volunteer or employee of the Named Assured while acting within the scope of his duties as such . . .

*    *    *

INSURING AGREEMENTS

This section applies only to bodily injury, personal injury or property damage which occur during the policy period and arise out of an occurrence which takes place within the territorial scope of the Policy . . .

C - LAW ENFORCEMENT LIABILITY: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of errors, omissions, or negligent acts arising out of the performance of the Assured's duties while acting as a law enforcement official or officer in the regular course of public employment as hereafter defined, arising out of any occurrence from any cause on account of Personal Injury, Bodily Injury, Property Damage [the latter policy adds Violation of Civil Rights] or First Aid, happening during the period of this insurance[.] . . .

\*     \*     \*

<u>DEFINITIONS</u>

1. PERSONAL INJURY–The term "personal injury" wherever used herein, shall mean Bodily injury, Mental Anguish, Shock, Sickness, Disease, Disability, Wrongful Eviction, Malicious Prosecution, Discrimination, Humiliation . . . In addition respects Insuring Agreement C only, "Personal injury" shall mean False Arrest, False Imprisonment, Detention and Violation of Civil Rights arising out of Law Enforcement Activities.

2. BODILY INJURY–The term "bodily injury" shall mean physical injury to any person (including death) and any mental anguish or suffering associated with or arising from such physical injury. . .

9. OCCURRENCE–The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which result in personal injury or damage to property during the policy period. All personal injuries to one or more persons and/or property damage arising out of an accident or event or a continuous or repeated exposure to conditions shall be deemed one occurrence.

(Underwriters & Northfield Trigger Issue 56.1 Resp. ¶ 26; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶¶ 8, 11-12.)

**d.     Westport's Policies.**

Westport's predecessor Coregis issued Public Entity Pooled Program Policy No. 651-006954-0 to Waukegan, with a policy period from November 1, 1997 to November 1, 1998. (Waukegan v. Westport 56.1 Resp. ¶ 30.) That policy was renewed for the period November 1, 1998 to November 1, 1999, and again for the period November 1, 1999 to November 1, 2000; each of

these three policies had a $1 million limit of insurance for each occurrence (collectively, "the Westport Primary Policies"). (Waukegan v. Westport 56.1 Resp. ¶ 30.) Those policies include law enforcement liability coverage and state that Westport will pay "all sums in excess of the 'Self Insured Retention' limit stated in the Policy Declarations that any 'Insured' becomes legally obligated to pay as damages . . . because of . . . 'Personal Injury' caused by an offense in the course of your 'Law Enforcement Activity.'" (Waukegan v. Westport 56.1 Resp. ¶ 34.) The Westport Primary Policies at issue state that "[w]e shall have the right and duty to defend or be associated with the defense of any claim or 'Suit' seeking damages to which Part II [including Law Enforcement Liability] applies...." (Waukegan v. Westport 56.1 Resp. ¶ 36.) The City is an insured under the Westport Primary Policies. (Waukegan v. Westport 56.1 Resp. ¶ 37.)

The Westport Primary Policies define "Law Enforcement Activity," in part as "all operations of your police force or any other public safety organization which enforces the law and protects persons or property." (Waukegan v. Westport 56.1 Resp. ¶ 40.) "Occurrence," under the policies, "means an accident caused by a 'Covered Cause of Loss', including continuous or repeated exposure to substantially the same general harmful conditions." (Waukegan v. Westport 56.1 Resp. ¶ 40.) "Personal Injury" is defined as "injury, other than 'Bodily Injury' arising out of one or more of the following offenses: (a) false arrest, detention or imprisonment; (b) malicious prosecution...." (Waukegan v. Westport 56.1 Resp. ¶ 40.)

The Westport Primary Policies state that "[Westport] will pay only for the loss that you sustain occurring during the Policy Period shown in the Declarations of this Policy." (Westport v. Waukegan 56.1 Resp. ¶ 27.) Those policies also have a provision prohibiting the City from "voluntarily" "[m]ak[ing] a payment," "[a]ssum[ing] any obligation" or "[i]ncur[ring] any expense"

without Westport's written consent." (Waukegan v. Westport 56.1 ¶ 29.) Westport also issued a series of umbrella policies to the City that were in effect November 1, 1997 to November 1, 2000 (together with the Westport Primary Policies, "the Westport Policies"). (Waukegan v. Westport 56.1 Resp. ¶ 41.)

### 4. Dominguez Insurance Claim Handling.

On April 11, 2007, six months after the verdict in the Dominguez Civil Case in October 2006, American Safety filed this Complaint for declaratory judgment seeking a coverage determination with respect to Dominguez's insurance claim with various carriers ("the Dominguez Claim"). (Waukegan v. American Safety 56.1 Resp. ¶ 76; Waukegan v. Interstate 56.1 Resp. ¶ 10.) The material facts specific to Waukegan's relationship with each insurer during the pendency of the Dominguez Civil Case and up until filing this declaratory judgment action are detailed below.

### a. American Safety.

Linda Ford has been the benefits administrator for Waukegan since 1989; she is responsible for maintaining all claims against Waukegan and ensuring that those claims are reported to a third party administrator. (American Safety v. Waukegan 56.1 Resp. ¶ 28.) Custard Claims served as the third party administrator for Waukegan's claims relevant to this case. (American Safety v. Waukegan 56.1 Resp. ¶ 29.) More specifically, Marianne Veltri ("Veltri") of Custard Claims handled the Dominguez claim and was responsible for keeping track of expenses that would exhaust the $100,000 SIR. (American Safety v. Waukegan 56.1 Resp. ¶ 29.)

On June 2, 2004, Waukegan was served with the Dominguez Civil Complaint and a waiver of service of summons with a return date for its answer of July 28, 2004. (Waukegan v. American Safety 56.1 Resp. ¶ 50.) Attorney Michael Noonan ("Noonan") was one of the attorneys who

defended Waukegan in the Dominguez Civil Case. (American Safety v. Waukegan 56.1 Resp. ¶ 31.)

In a letter to Veltri on June 17, 2004, Noonan provided his opinion that "the malicious prosecution claim would not have ripened until the judge vacated the judgment against him which would have been on April 26, 2002." (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 23; Underwriters & Northfield Trigger Issue 56.1 Resp. Add. Facts ¶ 18.)

On July 14, 2004, Custard Claims, through Veltri, provided actual notice of the Dominguez Civil Case and status of proceedings to American Safety, reporting the Dominguez claim on a precautionary basis. (Waukegan v. American Safety 56.1 Resp. ¶ 51.) Jean Fisher, American Safety's claims counsel, explained that if the insurer is on notice of a claim on a precautionary basis, its obligations are "generally, nothing" at that point in time, unless the insured asks the handler to accept the obligation–it does not at that time have to look at the policy to see if the provisions would apply. (Waukegan v. American Safety 56.1 Resp. ¶ 75.) In response to the City's notification, American Safety acknowledged notification, assigned a claim number, assigned Peter Hildebrand ("Hildebrand") as a supervisor to handle the claim, and demanded status reports over a two year period. (Waukegan v. American Safety 56.1 Resp. ¶¶ 52-53.) Fisher, when asked about American Safety's claims handling process in place at the time, explained that American Safety would receive notice of a claim, send a fax acknowledgment in response, and then the individual claim handler–in this case Hildebrand–would maintain the claim file. (Waukegan v. American Safety 56.1 Resp. ¶ 72.)

As early as August 6, 2004, Hildebrand the began receiving status reports from Noonan. (Waukegan v. American Safety 56.1 Resp. ¶ 53.) On November 18, 2004, in response to the question: "What is your position on primary coverage?" from Interstate employee Terry Donahoe

("Donahoe"), Hildebrand answered that "wrongful acts are covered under the primary policy."[5] (Waukegan v. American Safety 56.1 Resp. ¶ 56.) the time the Dominguez Civil Case was pending, Hildebrand was handing at least four other claims for Waukegan. (Waukegan v. American Safety 56.1 Resp. ¶ 53.) Hildebrand requested updates on the Dominguez civil case along with some of these other cases. (Waukegan v. American Safety 56.1 Resp. ¶ 54.) On December 6, 2004, for example, Hildebrand faxed Veltri comments on five of Waukegan's claims, identifying the date of accident for the Dominguez claim as April 26, 2002. (Waukegan v. American Safety 56.1 Resp. ¶ 54.) Noonan provided status updates to American Safety on an ongoing, regular basis throughout the Dominguez Civil Case. (Waukegan v. American Safety 56.1 Resp. ¶ 53; American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 22.) During the time that Hildebrand handled the Dominguez claim, he never denied coverage. (Waukegan v. American Safety 56.1 Resp. ¶ 57.)

After Hildebrand left his employment with American Safety in late 2005, the Dominguez claim file was transferred to Robert D'Olympio ("D'Olympio"). (Waukegan v. American Safety 56.1 Resp. ¶ 58.) D'Olympio had no prior experience handling public entity or law enforcement liability policy claims. (Waukegan v. American Safety 56.1 Resp. ¶ 59.) He did not contact Waukegan to announce his appearance on the case for several months even though regular status reports were still being sent to Hildebrand at American Safety. (Waukegan v. American Safety 56.1 Resp. ¶ 59.) D'Olympio contacted Veltri by email on April 12, 2006 asking about the probability

---

[5] American Safety asserts that Hildebrand's statements in this email are "extrinsic evidence which are not admissible to show what the policies intended when the insurance policies were drafted." (Waukegan v. American Safety 56.1 Resp. ¶ 56.) These statements might not be admissible for the purpose of interpreting what an unambiguous contract means, but they are admissions that American Safety believed the Dominguez Claim was covered under one of the American Safety policies. *See* F.R.E. 802(d)(2). American Safety's claims handler's belief is relevant to the Court's Section 155 "unreasonable and vexatious" analysis below.

of the outcome of the case. (Waukegan v. American Safety 56.1 Resp. ¶ 60.) Veltri forwarded status reports according to D'Olympio's expectations. (Waukegan v. American Safety 56.1 Resp. ¶ 60.)

D'Olympio testified one of the primary rights of an insured is to know if there is no coverage under a given policy. (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 27.) On June 6, 2006, Veltri contacted D'Olympio with a status update and to confirm that American Safety was the carrier with coverage for the Dominguez claim. (Waukegan v. American Safety 56.1 Resp. ¶ 61.) In his email response on that same day, D'Olympio suggested to Waukegan that there was no coverage under the American Safety policies, stating: "I don't understand why we would have any coverage at all for this matter . . . I continue to review the file and will also research this situation with respect to the DOL. Therefore, in answer to your question: 1) American Safety is *not* the carrier with coverage for this claim." (American Safety v. Waukegan 56.1 Resp. ¶ 33; American Safety v. Waukegan 56.1, Ex. K; Waukegan v. American Safety 56.1 Resp. ¶ 61; American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 28.) D'Olympio sent another email to Veltri two days later stating that based on the dates of arrest and imprisonment, it did not "appear" that the claim would be covered and suggested that he needed to contact an attorney. (Waukegan v. American Safety 56.1 Resp. ¶ 62.) In a separate email on June 8, 2006, D'Olympio told Veltri that he forwarded the coverage question to separate counsel in Illinois to obtain a second opinion. (Waukegan v. American Safety 56.1 Resp. ¶ 63.)

D'Olympio did not initiate any further communication with Veltri until September 22, 2006, when she wrote to him and reminded him that had expressed that he would research the date of loss. (Waukegan v. American Safety 56.1 Resp. ¶ 64.) Also in this email, Veltri reminded D'Olympio about the impending trial on October 3, 2006 and a $4,000,000 settlement demand; she also stated

that she needed American Safety's position on coverage. (Waukegan v. American Safety 56.1 Resp. ¶ 65.) D'Olympio responded to Veltri's email on September 25, 2006, explaining that he had not received a coverage opinion from Illinois counsel and stating that American Safety did not believe there was coverage for the claim; he then informed her that he would give a more detailed explanation the next day. (Waukegan v. American Safety 56.1 Resp. ¶¶ 66-67.) On September 26, 2006, seven days before the Dominguez Civil Case proceeded to trial and 27 months after American Safety received a copy of the Dominguez Civil Complaint, D'Olympio sent a letter to Veltri advising that the American Safety Policies do not provide coverage for the Dominguez claim. (American Safety v. Waukegan 56.1 Resp. ¶ 33; American Safety v. Waukegan 56.1 Resp. Add. Facts ¶¶ 32, 34.) More specifically, D'Olympio's letter explained that the date of loss was not within the applicable policy period. (Waukegan v. American Safety 56.1 Resp. ¶ 67.) Waukegan, through its counsel, William Anderson ("Anderson"), requested indemnification for the Dominguez Civil Case verdict on November 3, 2006. (Waukegan v. American Safety 56.1 Resp. ¶ 74.) American Safety then issued a claim denial to Waukegan through its attorney, Neil Kraetsch ("Kraetsch"), on December 8, 2006. (Waukegan v. American Safety 56.1 Resp. ¶ 73.) In this letter, Kraetsch explained that the occurrence was not within the policy period. (Waukegan v. American Safety 56.1 Resp. ¶ 73.)

American Safety did not appear and defend Waukegan or Hendley during the litigation, trial, or appeal of the Dominguez Civil Case, or defend under a reservation of rights. (American Safety v. Waukegan 56.1 Resp. Add. Facts ¶ 21.) Following the October 17, 2006 verdict of $9,063,000 in the Dominguez Civil Case, American Safety had declined to provide a defense or coverage to Waukegan under either relevant policy. (Waukegan v. American Safety 56.1 Resp. ¶ 76.)

### b.  Interstate[6]

On September 15, 2004, Veltri sent notice to of the Dominguez Civil Case to Interstate. (Waukegan v. Interstate 56.1 Resp. ¶ 51.)  Donahoe was a claims analyst for Interstate, a subsidiary of Fireman's Fund.  (Waukegan v. Interstate 56.1 Resp. ¶ 52.)  As early as September of 2004, Donahoe sent an email to Veltri stating that Donahoe would monitor the case through the primary carrier.  (Waukegan v. Interstate 56.1 Resp. ¶ 53.)  The Interstate claims file notes further show that Interstate received a number of updates about the status of the litigation after September 2004. (Interstate v. Waukegan 56.1 Resp. Add. Facts ¶ 26.)

On October 23, 2006, a week after the jury returned a verdict in favor of Dominguez, Interstate sent Waukegan a letter denying coverage based on the date of loss and Dominguez's incarceration not falling within the policy period.  (Waukegan v. Interstate 56.1 Resp. ¶ 64; 70; Interstate v. Waukegan 56.1 Resp. Add. Facts ¶ 35.)  On November 3, 2006, Waukegan Attorney Anderson sent Interstate a letter requesting indemnification.  (Waukegan v. Interstate 56.1 Resp. ¶ 74.)  Approximately one year later, on October 12, 2007, Interstate filed a declaratory judgment action against Waukegan in the Circuit Court for the Nineteenth Judicial Circuit, Lake County, seeking a declaration that its insurance policies did not provide coverage for the Dominguez Claim. (Waukegan v. Interstate 56.1 Resp. ¶ 65.)

---

[6] The Court notes that Interstate does not individually respond to Waukegan's Statement of Additional Facts in Opposition to Interstate's Motion for Summary Judgment, instead incorporating its responses and objections raised in its Motion to Strike and its Responses to Waukegan's Statement of Material Facts in Support of its Motion for Summary Judgment. Although many of the additional statements of fact are identical to those raised in Waukegan's Rule 56.1 statement, in accordance with Local Rule 56.1, the Court deems admitted all of those additional facts not raised in Waukegan's original Statement of Material Facts. *See* L.R. 56.1 ("All material facts set forth in the statement filed pursuant to section (b)(3)(C) [the statement of any additional facts requiring the denial of summary judgment] will be deemed admitted unless controverted by the statement of the moving party.").

### c.    Underwriters and Northfield.

The City reported the Dominguez Civil Case to Underwriters in a letter from Veltri on January 19, 2005. (Waukegan v. Underwriters 56.1 Resp. ¶ 45.) On January 11, 2006, Underwriters sent Waukegan a reservation of rights letter concerning coverage for the November 1, 1992 to November 1, 1994 policy period. (Waukegan v. Underwriters 56.1 Resp. ¶ 45.) Underwriters reserved its rights for the other policy periods in October 2006 and December 2009. (Waukegan v. Underwriters 56.1 Resp. ¶¶ 54, 58, 61.) Northfield received notice of the Dominguez Civil Case in a letter from Veltri dated September 17, 2004. (Waukegan v. Northfield 56.1 Resp. ¶¶ 46, 72.) On October 6, 2006, Northfield sent the City a letter reserving its rights. (Waukegan v. Northfield 56.1 Resp. ¶ 50; Waukegan v. Northfield 56.1 Exhibit 22.)

### d.    Westport.

Westport received the July 14, 2004 letter from Veltri reporting the Dominguez suit "on a precautionary basis." (Waukegan v. Westport 56.1 Resp. ¶ 48.) Westport's claims handler reviewed all the Westport Policies in connection with his analysis of the Dominguez Claim prior to sending a letter on September 17, 2004, denying coverage under a 1988-1989 policy that did not have law enforcement coverage. (Waukegan v. Westport 56.1 Resp. ¶ 50; Westport v. Waukegan 56.1 Resp. Add. Facts ¶ 37.) Westport did not file a declaratory judgment against the City with regard to policies Westport had issued to the City. (Waukegan v. Westport 56.1 Resp. ¶ 59.) On January 23, 2007, Westport sent a letter to Waukegan's attorney declining coverage under the Westport Policies, on the grounds that none of the dates of incidents described in Dominguez's complaint occurred during any of Westport's policy periods, as well as several other grounds. (Waukegan v. Westport 56.1 Resp. ¶¶ 61-62.)

## 5.    Waukegan's Damages

On May 12, 2008, Judge Shadur ordered that "a letter of credit be posted by the City of Waukegan in favor of Dominguez's attorneys in the total sum of $10,047.195,39. (Waukegan v. American Safety 56.1 Resp. ¶ 77; Waukegan v. Interstate 56.1 Resp. ¶ 75; Waukegan v. Westport 56.1 Resp. ¶ 65.) On May 22, 2009, he issued an order authorizing Dominguez to draw on the letter of credit in this amount. (Waukegan v. American Safety 56.1 Resp. ¶ 77; Waukegan v. Interstate 56.1 Resp. ¶ 75; Waukegan v. Westport 56.1 Resp. ¶ 65.) On December 21, 2009, Waukegan issued an ordinance providing for the issuance of $11,452,000 of General Obligation Bond Anticipation Notes to pay the verdict amount in the Dominguez Civil Case as well as certain attorneys' fees incurred in the litigation. (Waukegan v. American Safety 56.1 Resp. ¶ 78; Waukegan v. Interstate 56.1 Resp. ¶ 76.) A March 9, 2010 Satisfaction of Judgment provided that:

> S. Alejandro Dominguez, the judgment creditor, having received full satisfaction and payment, releases the judgment against Paul Hendley entered on October 17, 2006 as modified by the judgment order entered on December 13, 2006 against Paul Hendley and the City of Waukegan in the amount of $9,063,000 and the judgment entered against Paul Hendley and the City of Waukegan on August 7, 2007 in the amount of $517,532 as well as all accrued interest and additional costs and attorneys fees accrued by judgment creditor since August 21, 2007.

(Waukegan v. American Safety 56.1 Resp. ¶ 79; Waukegan v. Interstate 56.1 Resp. ¶ 77.) Waukegan has currently paid a total of $11,397,195.39 in satisfaction of the judgment entered against Hendley and Waukegan and in attorneys' fees and interest. (Waukegan v. American Safety 56.1 Resp. ¶ 80; Waukegan v. Interstate 56.1 Resp. ¶ 78; Interstate v. Waukegan 56.1 Resp. Add. Facts ¶ 38.) It also incurred approximately $1,079,296 of its own attorneys' fees and costs while defending itself and Hendley in the Dominguez Civil Case and subsequent appeal. (Waukegan v. American Safety 56.1 Resp. ¶ 80.)

### B.     Summary Judgment Standard.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

### C.     Illinois Law Applies.

As an initial matter, none of the parties contends that Illinois' choice of law rules require us to apply the substantive law of another state, and the Court applies Illinois law.  *See S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co*., 302 F.3d 667, 672 (7th Cir. 2002) (internal citations omitted); *see also Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (internal citation and quotation marks omitted) ("Courts do not worry about

conflict of laws unless the parties disagree on which state's law applies."). Specifically, the Court

will "apply the law that [it] believe[s] the Supreme Court of Illinois would apply if the case were

before that tribunal rather than before this court." *Help at Home, Inc. v. Med. Capital, L.L.C.*, 260

F.3d 748, 753 (7th Cir. 2001). Under Illinois law, "[t]he construction of an insurance policy and a

determination of the rights and obligations thereunder are questions of law for the court which are

appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers*

*Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1998).

### D. American Safety's and Waukegan's Cross-Motions for Summary Judgment.

American Safety's declaratory judgment action filed against Waukegan on April 11, 2007

seeks declarations that American Safety is "under no obligation to indemnify the City of Waukegan

under the 2000 Policy or 2001 Policy for judgment in the lawsuit" and that it "is under no obligation

to reimburse the City of Waukegan for fees and costs incurred in the lawsuit." (Doc. 1, at Prayer for

Relief.) Waukegan's operative counterclaim against American Safety alleges breach of contract

(Count I); declaratory judgment (Count II); and violation of the Illinois Insurance Code (Count III).

(Doc. 273, pp. 15-19.) American Safety argues that it is entitled to summary judgment on both its

declaratory judgment claim and the City's counterclaim because it had no duty to defend Waukegan

as the American Safety Policies were not triggered by the allegations in the Underlying Complaint.

In the alternative, American Safety raises the policy defense that Waukegan voluntarily assumed

Hendley's liability. American Safety further maintains that Waukegan's Section 155 claim fails.

### 1. American Safety Breached its Duty to Defend.

The parties first dispute whether American Safety had any duty to defend or duty to

indemnify Waukegan - the subject of both Waukegan's and American Safety's declaratory judgment

claims. An insurer may assert that it had no duty to defend (1) where the insurer was given no opportunity to defend; (2) where there was no insurance policy in existence; or (3) where coverage is not triggered by the allegations in the underlying complaint; in other words, when comparing policy and the complaint, there "clearly was no coverage or potential for coverage." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122,1135 (Ill. 1999). It is undisputed that the American Safety Policies were in effect, and that American Safety had actual notice of the Underlying Complaint, sufficient to give American Safety an opportunity to defend. *See id.* at 1131 (noting that under Illinois law, tender of the defense is not necessary to trigger the duty to defend, only "actual notice.") Under the third circumstance above, the Court examines "the underlying complaint and the language of the insurance policy," resolving "[a]ny doubts as to whether particular claims fall within the policy . . . in favor of coverage." *Nat'l Casualty Co. v. McFatridge*, 604 F.3d 335, 338 (7th Cir. 2010) (applying Illinois law). An insurer may, however, "refuse to defend an action in which, from the face of the complaint, the allegations are clearly outside the bounds of the policy coverage." *See id.*

### a. American Safety Had a Duty to Defend

American Safety argues that it had no duty to defend, and hence no duty to indemnify, Waukegan for the Dominguez Claim because the triggering offenses "occurred" for insurance purposes at the time of Dominguez's arrest and prosecution in 1989, not Dominguez's exoneration in April 2002, indisputably within one of American Safety's policy periods of November 1, 2001 to November 1, 2002. The law enforcement liability term of American Safety's Policies provides for coverage for "'bodily injury' or 'property damage' caused by an 'Occurrence' in the course of a 'Law Enforcement Activity' or because of an 'Advertising Injury' or 'Personal Injury' caused by an offense in the course of your 'Law Enforcement Activity.'" When construing policies like these

that provide for coverage on an occurrence basis in order to determine if the insurer had a duty to defend, the Court first determines "whether the particular policy contemplated coverage for" Dominguez's Civil Case and then turns to the question of "whether any of the allegations in" the Underlying Complaint "'occurred' during the coverage periods." *Id.* at 338.

To begin, the law enforcement liability provisions of the American Safety Policies clearly contemplated coverage for Dominguez's Civil Case. Both policies cover "'Personal Injury' caused by an offense in the course of [the insured's] 'Law Enforcement Activity." American Safety admits that Dominguez's claims in the Underlying Complaint constituted personal injury claims for offenses caused in the course of Waukegan's law enforcement activities. More specifically, it concedes that under its policies, Dominguez's claims of false arrest and malicious prosecution fall within the definition of "personal injury."

Turning to the issue of whether the allegations in the Underlying Complaint occurred during the policy periods, the Seventh Circuit's decision in *McFatridge*, handed down during the parties' summary judgment briefing, controls. As an initial matter, contrary to American Safety's suggestion, this case is binding on this Court as the Illinois Supreme Court has not squarely addressed the issue of when insurance coverage is triggered for civil rights claims. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("By treating [the Seventh Circuit's interpretation of state intermediate appellate decision] as having no more than persuasive force, the district court made a fundamental error . . . . district judges must follow the decisions of this court whether or not they agree. . . . Once the state's highest court acts, the need for prediction is past. But decisions of intermediate state courts lack similar force . . . . they do not themselves liberate district judges from the force of our decisions.").

The *McFatridge* court applied the Supreme Court's discussion of the torts of false arrest and malicious prosecution in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) and *Wallace v. Kato*, 549 U.S. 384, 390-93 (2007) to determine when these claims accrue for insurance purposes. The Seventh Circuit held that for insurance coverage purposes, a Section 1983 false imprisonment claim like Dominguez's, "accrues . . . when [the plaintiff] is held pursuant to a warrant or other judicially issued process." *See McFatridge*, 604 F.3d at 344. That is because "[a] § 1983 false imprisonment claim seeks damages for injury caused by the plaintiff's detention without probable cause," and proof of exoneration or reversal is not a necessary element of such a claim. *See id.*[7] Here, it is undisputed Dominguez was first arrested pursuant to a judicially issued warrant in 1989. As such, his Section 1983 false arrest and false imprisonment claims accrued well before the policy periods for either of American Safety's policies, which spanned the time between November 1, 2000 and November 1, 2002. *See id.*

Claims that "challenge the validity of [an individual's] conviction," on the other hand, such as "claims for unconstitutional conviction, imprisonment, and denial of due process," do not accrue until an individual proves that his "'conviction . . . has been reversed on direct appeal, . . . or called

---

[7] In an attempt to persuade the Court not to apply the principles set forth in *McFatridge,* American Safety argues that "[w]hile a recent 7th Circuit decision stated that malicious prosecution cases are triggered on exoneration, the decision was based upon a case which has been overturned and provides no precedential value." (Doc. 571 at 4.) Specifically, American Safety faults the decision in *McFatridge* for relying on the reasoning of the Illinois Appellate Court in *Security Mutual Casualty Company v. Harbor Insurance Company*, 382 N.E.2d 1 (Ill. App. Ct. 1978), because that case was later reversed by the Illinois Supreme Court. *See Sec. Mut. Cas. Co. v. Harbor Ins. Co.*, 397 N.E.2d 839, 842 (1979). In fact, however, the Illinois Supreme Court considered on appeal only the question of whether the agreement between the parties was subject to arbitration, finding that the Illinois Appellate Court had exceeded its scope of review because the agreement was subject to arbitration. *See Sec. Mut.*, 397 N.E.2d at 841-42. The Illinois Supreme Court, accordingly, did not reverse or even comment on the substance of the Illinois Appellate Court's analysis of the accrual time for a plaintiff's state law malicious prosecution claims. *See id.* Moreover, the *McFatridge* court cited *Security Mutual* only once, for the proposition that a plaintiff's state law malicious prosecution claims did not occur until his underlying conviction was invalidated. *See McFatridge*, 604 F.3d at 345. In doing so, it clarified that the Illinois Appellate Court's decision had been reversed on other grounds. *See id.* at 344-45. Finally, far from relying primarily on the *Security Mutual* decision, the majority of the Seventh Circuit's analysis applies Supreme Court caselaw in *Heck*, 512 U.S. 477, and *Wallace*, 549 U.S. at 390-93 comparing the torts of false imprisonment and malicious prosecution to determine when those claims accrue for insurance purposes. *See id.* at 344 (citing *Heck*, 512 U.S. at 486-87).

into question by a federal court's issuance of a writ of habeas corpus.'" *See id.* at 344 (quoting *Heck*, 512 U.S. at 486-87). The *McFatridge* court reasoned that because a malicious prosecution claim requires a plaintiff to plead and prove the fundamental element of termination of prior criminal proceedings in favor of the accused, a malicious prosecution claim does not accrue until that termination occurs. *See id.* Thus, the insured in *McFatridge* did not "have a complete cause of action" and no "offense of wrongful conviction or deprivation of due process" occurred until the day the district court issued a writ of habeas corpus. *See id.* Similarly here, Dominguez's Section 1983 claim for a violation of due process through malicious prosecution accrued at the time of his exoneration on April 26, 2002.[8]

The court in *McFatridge* also held that under Illinois law, a "state law malicious prosecution claim depends upon the invalidation of [the individual's] underlying conviction." *See id.* at 344 (citing *Cult Awareness Network v. Church of Scientology, Inter.*, 685 N.E.2d 1347, 1351 (Ill. 1997)); *see also Sec. Mut. Cas. Co. v. Harbor Ins. Co.*, 382 N.E.2d 1, 6 (Ill. App. Ct. 1978) (finding a claim for malicious prosecution triggers coverage on the date the underlying action is resolved in the plaintiff's favor). Thus, Dominguez's malicious prosecution claim under Illinois law did not accrue until the underlying convictions were vacated on April 26, 2002. *See McFatridge*, 604 F.3d at 344. The parties do not dispute that this invalidation of the underlying convictions occurred between November 1, 2001 and November 1, 2002, the policy period of one of American Safety's policies.

---

[8]American Safety relies on a district court decision in *Selective Insurance Company of South Carolina v. City of Paris* for the proposition that the "tort of malicious prosecution occurs for insurance coverage purposes . . . when the underlying criminal charges are filed." No. 07-CV-2224, 2010 WL 367543, at, *4-8 (C.D. Ill. Jan. 27, 2010) (McCuskey, C.J.). Not only is *Selective* not binding precedent, it was decided before the Seventh Circuit's decision in *McFatridge* on April 28, 2010, which clearly held that malicious prosecution claims accrue at the time of a reversal of a conviction or exoneration. *See McFatridge*, 604 F.3d at 344. *Selective* also fails to address the binding precedent of *Heck*, 512 U.S. 477, and *Wallace*, 549 U.S. 384, the two cases relied on by the *McFatridge* court. *See id.*

Under Illinois law, "if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy." *See Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010) (internal citations omitted); *see also Ehlco*, 708 N.E.2d at 1136 (finding "[t]he insurer may not refuse to defend 'unless it is *clear* from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.") (internal citation omitted). Because the Underlying Complaint states facts supporting causes of action for malicious prosecution under both federal and state law, and those claims accrued for insurance purposes during American Safety's policy period, American Safety's duty to defend was triggered.

The Court need not address Waukegan's underdeveloped argument that, under the terms of American Safety's Policies, law enforcement liability claims do not need to accrue during the relevant policy period to trigger the duty to defend. Waukegan claims that because section "a. General Liability" of section of each policy states that "[t]he above stated coverage applies only if the 'Occurrence' or offense occurs during the policy period" but the "Law Enforcement Liability" section contains no such statement, the policies' Law Enforcement Liability coverage applies regardless of when the offense or injury occurs or accrues. Even if the Court were to address it, the unambiguous policy terms make clear that loss must be sustained during the relevant policy period. Part II of the policies describes individual policy terms (for General Liability, Law Enforcement Liability, Automobile Liability and Automobile Physical Damage Coverage Parts), and then Part III, Section I provides "Common Policy Conditions." One such condition, number 24, is "[w]e will pay only for loss that you sustain occurring during the Policy Period shown in the Declarations of this policy." Pursuant to the plain meaning of this language, "common" to each of the individual liability

policies described in Part II is a "condition" that American Safety will only pay for loss sustained during the policy period. In light of this affirmative language, the mere absence of language about the policy period in the description of law enforcement liability in Part II is not enough to render the policy ambiguous. *See Krusinski Const. Co. v. Northbrook Property & Cas. Ins. Co.*, 760 N.E.2d 530, 537 (Ill. App. Ct. 2001) ("If the terms of [a] policy are clear and unambiguous, they must be given their plain and ordinary meaning."); *see also Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself.").

Indeed, from a practical standpoint, if the Law Enforcement Liability applied regardless of when the injury or offense occurred, there would be no need for an insured to ever obtain a new insurance policy – in essence, once an insured purchased a policy for a given period of time, the insurer would forever be liable for any qualifying injury caused by a law enforcement activity. If this were the parties' intent, there would be no need for the policies themselves to contain language about the policy period or for Waukegan to obtain a new policy from American Safety covering law enforcement liability when the second American Safety policy expired. *See Elson v. State Farm Fire and Gas. Co.*, 691 N.E.2d 807, 811 (Ill. App. Ct. 1998) ("In construing insurance contracts, the Court's primary purpose is to give effect to the intention of the parties as expressed therein."); *see also Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 193 (Ill. App. Ct. 2004) ("[G]reat weight is to be given to the principal, apparent purpose and intention of the parties at the time that they entered into the contract"). Thus, even if the Court were to consider Waukegan's argument that law

enforcement liability applies regardless of when the injury or offense occurred, it is not supported by the language of the Policies.  *See id.*

        **b.**      **Exhaustion of Waukegan's Self Insured Retention Was Not a Precondition to the Duty to Defend and Does Not Excuse American Safety From Its Duty to Defend.**

Both of American Safety's Policies provide, in relevant part, that "'[t]he self insured retention' [SIR] shall be paid by the insured prior to any obligation on the part of this Company." Pointing to this policy language, American Safety argues: (1) that its duty to defend did not arise until the SIR of $100,000 was exhausted, and (2) the SIR was not exhausted until November 1, 2006, when defense counsel submitted its bill to Waukegan.  Waukegan responds that the SIR provision does not affect American Safety's duty to defend.

"Where competing reasonable interpretations of a policy exist, a court is not permitted to choose which interpretation it will follow . . . rather, in such circumstances, the court must construe the policy in favor of the insured and against the insurer that drafted the policy."  *Ehlco.*, 708 N.E.2d at 1130.  The American Safety Policies state that any "obligation" on American Safety's part does not begin until the SIR is covered, but the SIR language at issue does not mention the duty to defend. This SIR language is reasonably interpreted to mean that American Safety simply has no obligation to pay any judgments or costs until the SIR is exhausted, but it does not affect American Safety's duty to defend.  *See LaRotunda v. Royal Globe Ins. Co.*, 408 N.E.2d 928, 933 (Ill. App. Ct. 1980) (clarifying that an insurer's duty to defend is separate and distinct from the duty to pay, where "the duty to defend is broader than the duty to pay"); *McFatridge*, 604 F.3d at 338 (noting "[a]n insurer's duty to defend its insured is broader than its duty to indemnify").  The Court construes the SIR provision to mean that American Safety's liability obligations did not attach until exhaustion of the

SIR, and consequently exhaustion of the SIR was not necessary before American Safety had a duty to defend the City.[9]

One case cited by American Safety, *Trinity Homes, LLC v. Ohio Cas. Ins. Co.*, No 04-1920, 2007 WL 1021825 (S.D. Ind. Mar. 30, 2007), underscores the difference between language that would apply an exhaustion precondition and the actual language at issue here. In that case, the policy explicitly stated that the insurer had the "right but not the obligation to assume charge of the defense," and that the "duty to defend provision . . . will only apply in the event that one of the first two 'Self-Insured' Retentions . . . of this endorsement is exhausted by actual payment according to the terms of this endorsement." *See id.* at *14. In other words, it was clear on the face of the policy in *Trinity Homes* that the duty to defend would not be triggered until one SIR was exhausted, *see id.*, whereas here, the policies do not give any indication that the SIR functions as an exception or exclusion to American Safety's duty to defend.

The other case American Safety relies on, *National Union Insurance Co. v. Dowd & Dowd, P.C.*, 2 F. Supp. 2d 1013 (N.D. Ill. 1998), involved a motion to dismiss a legal malpractice claim where an insured claimed that an attorney-client relationship was formed between itself and its insurer, and the Court held that no such relationship existed because the insurer was an excess carrier with no duty to defend. *See id.* at 1016-18. The Court explained that unlike a primary insurer who has a duty to defend and would thus be subject to a tripartite attorney-client relationship, the excess insurer had no "duty to defend the insured" because the excess policy at issue "did not attach until

---

[9] Waukegan cites *Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1074-75 (7th Cir. 2004), where the insurance company had a SIR clause of $2 million in its policy and asserts that the Seventh Circuit found that exhaustion of the SIR was not a precondition on the duty to defend. *Id.* While it is true that the Seventh Circuit found the carrier breached its duty to defend in that case, the court's analysis of the SIR concerned allocation defense costs between two carriers, not the duty defend. *See id.* The court it did not address the question of whether the SIR clause was a precondition on the duty to defend; nor is it clear that specific issue was raised before the court. *See id.*

a predetermined amount of primary insurance [was] exhausted." *See id.* at 1018. The court explained that "an excess carrier typically has no right to select counsel or direct counsel's actions." *Id.* Far from being an excess carrier with no duty or right to select counsel or defend, American Safety's Policies state unequivocally that American Safety "shall have the right and duty to select counsel and defend any claims seeking damages to which Part II applies." Not only does *National Union* fail to explain how an SIR functions with respect to a primary insurer (as opposed to an excess carrier), it does not even address the question of how an SIR provision functions when a policy contains a duty to defend. *See id. National Union* is inapposite here.

### c. Waukegan's Supposed "Voluntary" Assumption of Hendley's Liability Does Not Excuse American Safety From Its Duty to Defend.

American Safety claims next that it had no duty to defend Waukegan because the City failed to secure American Safety's consent before assuming Hendley's obligation, in violation of the policy provision that the insured, must not "[m]ake a payment; assume any obligation; or incur any expense" without the express written consent of American Safety. However, this provision, like the SIR provision, is not connected to the duty to defend. The Court, recognizing that it must choose the interpretation favorable to Waukegan if both are reasonable, does not interpret the voluntary assumption provision as a precondition on American Safety's duty to defend. If anything, the voluntary assumption provision is a policy defense, and American Safety is estopped from raising policy defenses, as described below. In any event, the defense fails on its merits. Analyzing the same provision in Interstate's policy below, the Court finds the City's assumption of Hendley's liability was not voluntary, but rather a recognition of the City's obligations under the Illinois Tort Immunity Act.

### 2. American Safety Breached its Duty to Defend and Is Estopped From Raising Policy Defenses.

Because the Court has determined that American Safety has a duty to defend, it next turns to the question of whether American Safety breached that duty to defend, and consequently, is estopped from raising policy defenses. Under Illinois law, "an insurer has three options if it contests its duty to defend: (1) seek a declaratory judgment regarding its obligations before trial of the underlying action; (2) defend the insured under a reservation of rights; or (3) refuse either to defend or to seek a declaratory judgment at the insurer's peril that it might later be found to have breached its duty to defend and estopped from asserting defenses as to payment based on non-coverage." *Santa's Best*, 611 F.3d at 349; *see also Ehlco*, 708 N.E.2d at 1138 (holding "[i]f the insurer fails to take either of these steps [filing a timely declaratory judgment or defending under a reservation of rights] and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage, . . . [as] a breach of that duty constitutes a repudiation of the contract."). Because the equitable doctrine of estoppel "applies only where an insurer has breached the duty to defend," the Court "first inquires whether the insurer . . . breached that duty [to defend]." *See Uhlich Children's Advantage Network v. Nat. Union Fire Co. of Pittsburgh, PA*, 929 N.E.2d 531, 538 (Ill. App. Ct. 2010). Here, it is undisputed that American Safety did not defend the Dominguez Civil Case under a reservation of rights.

Further, American Safety's filing of the instant declaratory judgment action was untimely as a matter of law. "Illinois courts have three tests to measure the timeliness of the declaratory action . . . [i]t must be filed: (1) before the underlying action is resolved; (2) "before settlement or trial is imminent;" or (3) within a reasonable time of being notified of the underlying suit. *Santa's Best*, 611 F.3d at 349 (internal citations omitted). Where "an insurer waits to bring a declaratory judgment

action until after the underlying action has been resolved by a judgment or a settlement, the insurer's declaratory judgment action is untimely as a matter of law." *Ehlco*, 708 N.E.2d at 1138. American Safety did not file its declaratory judgment action either before the resolution of the Dominguez Civil Case or before the trial was imminent, nor does it claim that it satisfied the third option of being filed within a reasonable time frame of notification. American Safety received notice of the Underlying Complaint on July 14, 2004, and did not file its declaratory judgment action until in April 2007, nearly six months after resolution of the case.

American Safety's only argument that its filing was timely is that it was not required to file the declaratory judgment action until the SIR was exhausted. Specifically, American Safety contends that after receiving notice from Waukegan of the Dominguez Civil Case, it had no duties under the Policy until Waukegan notified American Safety that it had exhausted the SIR total of $100,000. It argues the filing the declaratory judgment action as soon as it received precautionary notice prior to exhaustion of the SIR would be premature. This argument is a spin on the SIR argument above, and is unsuccessful for the same reasons. Further, this rationale does not fall within any of the three categories for measuring the timeliness of a declaratory judgment action under Illinois law. *See Santa's Best*, 611 F.3d at 349. Because American Safety's declaratory judgment action was untimely as a matter of law, it did not defend under a reservation of rights, and it did not defend Waukegan in the Dominguez Civil Case pursuant to the duty that had attached at that time, it breached its duty to defend. *See id.* For that reason, it is estopped from invoking the voluntary assumption of liability clause that the Court found above was a policy defense. *See Ehlco*, 708 N.E.2d at 1135.

### 3. American Safety Must Indemnify Waukegan to the Policy's Limits, Pay the Attorney's Fees Waukegan Incurred in Dominguez Civil Case, and Make the Applicable Supplemental Payments Described in the Policy.

The Court has determined that the events alleged in the Underlying Complaint occurred during American Safety's policy period and American Safety's defenses of the SIR provision and voluntary assumption fail. The City incurred $11,397,195.39 in losses from the Dominguez Civil Case, well beyond the SIR of $100,000. Consequently, under the terms of the American Safety policy at issue, American Safety must indemnify the City for $1,000,000, the policy limits, after the first $100,000 the City is obligated to pay.

In its prayer for relief, Waukegan seeks declaratory judgment that American Safety is responsible for the entire Dominguez verdict, well beyond its $1,000,000 policy limits, including Waukegan's attorney's fees and costs in the Dominguez suit. The City supports this request only in passing, stating that American Safety "must be estopped from raising any policy defenses to coverage, including invocation of policy limits for payment of all sums, application of self-insured retention or any other exclusions." (Doc. 459 at 15). Under Illinois law, however, "the mere failure to defend does not, in the absence of bad faith, render the insurer liable for that amount of the judgment in excess of the policy limits." *Conway v. Country Cas. Ins. Co.*, 442 N.E.2d 245, 249 (Ill. 1982); *see also Guillen v. Potomac Ins. Co.*, 751 N.E.2d 104, 118 (Ill. App. Ct. 2001) (citing *Conway*). An insurer can be liable beyond its policy limits, however, if the insured shows it incurred other expenses, including attorneys' fees because of the insurers breach of the duty to defend. *See Conway*, 442 N.E.2d at 249 (internal citations omitted) (holding "[t]he failure to defend however, does expose the defendant to the additional liability for the cost and expense which plaintiff was put to by reason of defendant's breach of the contract and embraces reasonable attorney's fees.")

Waukegan devotes no briefing to arguing American Safety acted in such bad faith that it should pay the entire Dominguez loss. Indeed, though American Safety acted unreasonably and vexatiously in its handling of the *Dominguez* claim as detailed below, the record does not support the conclusion that American Safety deliberately misled or lied to Waukegan or approached the handling of the Dominguez claim with malicious intent.

However, the City seeks declaratory judgment that American Safety must reimburse it for the attorneys' fees and costs it incurred in defending the Dominguez Civil Case. (Doc. 273 at Count II, Prayer for Relief, (g)). The City has shown that it incurred expenses associated with American Safety's breach, namely the attorneys' fees and costs incurred to defend itself and Hendley[10] in the Dominguez Civil Case, which the American Safety admits is $1,079,296. In sum, Waukegan has not shown any bad faith on the part of American Safety, but has shown that it incurred expenses in the form of attorneys' fees as a direct result of American Safety's breach, its recovery against American Safety is the policy limits, $1,000,000, plus $1,079,296 in the attorneys' fees it paid to defend the Dominguez Civil Case, for a total of $2,079,296.

Further, under the American Safety policy, American Safety is responsible for other amounts above the policy limits, including "[a]ll costs taxed against" Waukegan in the Dominguez Civil Case, prejudgment interest awarded against the Waukegan on that part of the judgment for which American Safety is responsible, and "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [American Safety has] paid." As the Court finds below that Interstate must indemnify the City for the Dominguez loss, the question of the amount of the judgment against Interstate may depend on the amount of costs and interest American Safety is

---

[10] Waukegan may recover the fees it incurred in defending Hendley. The City is required by law to indemnify Hendley because caused injury while acting within the scope of his employment. *See* 745 ILCS 10/9-102 and the discussion below in Section III.E.3.

obligated under its policy to pay. The Dominguez verdict was for $9,063,000 in compensatory damages, and the City paid $11,397,195.39 to satisfy the judgment. However, the record does not adequately break out the $2,334,195.39 above the verdict into buckets for costs, pre- and post-judgment interest, and Dominguez's attorneys' fees. With seven (7) days of entry of this Order, the Court directs American Safety and Interstate to jointly file papers listing an agreed-upon amount of costs and interest that American Safety is obligated to pay under its policy. Interstate's responsibility will be reduced by that amount, and the Court will enter final judgment under Rule 58. If American Safety and Interstate cannot agree on an amount, the parties are directed to submit separate accountings and supporting documentation within seven days.

### 4. American Safety Is Liable Under Section 155 of the Illinois Insurance Code.

Waukegan also seeks summary judgment on its claim that American Safety acted "unreasonably and vexatiously" in its handling its Dominguez claim in violation of Section 155 of the Illinois Insurance Code. That provision, in part, provides:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorneys fees . . . .

215 ILCS 5/155. "The statute provides an extracontractual remedy to policyholders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Creamer v. Ins. Exchange Agency*, 675 N.E.2d 897, 900 (Ill. 1996). No single factor controls this "vexatious and unreasonable" analysis; rather, the totality of the circumstances must be considered. *See Golden Rule Insu. Co. v. Schwartz*, 786 N.E.2d 1010, 1018 (Ill. 2003). Relevant considerations for the Court in determining whether an insurer acted in a vexatious and unreasonable manner are:

"the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property." *Siwek v. White*, 905 N.E.2d 278, 284 (Ill. App. Ct. 2009) (internal citation omitted). Where the insurance company demonstrates a "*bona fide* dispute as to whether an insurance policy was in effect at the time of the loss, an insurer's refusal to pay a claim is not vexatious and unreasonable under section 155." *See Peerless Enter., Inc. v. Kruse*, 738 N.E.2d 988, 1000 (Ill. App. Ct. 2000). Whether an insurer's conduct was vexatious and unreasonable is a question for the Court's determination, not a jury. *See Horning Wire Corp. v. Home. Indem. Co.*, 8 F.3d 587, 590 (7th Cir. 1993).

Here, American Safety did not deny coverage or issue a reservation of rights letter in the two year period between receiving notice of the Underlying Complaint and the eve of trial, even though it received regular updates about the case during that time. American Safety did not definitively deny coverage until seven days before the trial began. Indeed, between receiving actual notice of the claim on July 14, 2004 and mid 2006, when replacement claim handler D'Olympio raised his doubts regarding coverage to Waukegan's claim administrator, American Safety said nothing to Waukegan to suggest that American Safety believed the Dominguez case was not covered. American Safety's communications with Interstate reflect the same understanding. Correspondence between Hildebrand, American Safety's original claim handler, and an Interstate representative show that American Safety believed it should cover the Dominguez claim as of November 2004. Moreover, American Safety knew that Waukegan was operating under the assumption that the claim was covered. American Safety knew about the $4 million settlement offer Waukegan passed up before the trial before it formally denied coverage. D'Olympio admitted that he received an email from the third-party administrator, Veltri, expressing her belief that American Safety would cover the *Dominguez* Civil Case.

American Safety appears to argue that the law was unsettled as to when false arrest and malicious prosecution claims accrued for insurance purposes prior to *McFatridge*, and consequently, there was a bona fide dispute and therefore no Section 155 liability. *See, e.g., Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000) (recognizing that an unsettled question of law may represent a bona fide dispute defeating Section 155 liability). Even if the Court accepted American Safety's premise that Illinois law on the trigger issue was unsettled prior to *McFatridge* because *Security Mutual* had been reversed by the Illinois Supreme Court on grounds having nothing to do with the trigger issue, American Safety's actions are not consistent with an insurer asserting a bona fide dispute on an unsettled question of law. American Safety's claims handler testified that testified one of the primary rights of an insured is to know if there is no coverage under a given policy. American Safety did not suggest to Waukegan that coverage depended on an open question of law for over two years. If this was truly a "bona fide" dispute, American Safety should have raised it sooner than two years via a declaratory judgment action. Further, American Safety did not seek a court's decision on this disputed question of law until it filed this case *after* the Dominguez trial. Even if the Court accepts American Safety's contention that Waukegan had written notice as of June 6, 2006–via D'Olympio's email–that American Safety was denying coverage, it waited over ten months to file the instant suit to sort out that coverage.

An Illinois court upheld a finding of Section 155 liability in similar circumstances as this case. In *Korte Construction Company v. American States Insurance*, 750 N.E.2d 764 (Ill. App. Ct. 2001), the insurer refused to defend its insured, later raising several policy defenses. The court found the insurer was estopped from raising those defenses. The insurer asserted that, at the very least, it should escape Section 155 liability because the question as to whether those policy defenses applied demonstrated a bona fide dispute. The court rejected this argument, and found the insurer's failure

to defend under a reservation of rights or file a declaratory judgment action to be "unreasonable and vexatious" conduct. Specifically, the court found the insurer "should have raised these disputes in a declaratory judgment action or defended [the insured] under a reservation of rights, instead of simply denying its duty to defend . . . ." *Id.* at 772; *see also Peerless*, 738 N.E.2d at 1000 (finding an insurer's failure to defend under a reservation of rights or file a declaratory judgment action supports Section 155 liability).

Section 155 permits "reasonable attorneys fees."[11] Waukegan's shall submit within seven (7) days of this Order a fee petition listing the attorneys' fees it incurred to bring its counterclaims against American Safety. The Court cautions Waukegan that Section 155 provides that where there are several policies that apply to the same loss (see below analysis finding Interstate must indemnify Waukegan under the Interstate excess policy), "the court may fix the amount of the allowance so that the total attorney fees on account of one loss shall not be increased by reason of the fact that the insured brings separate suits on such policies." 215 ILCS 5/155(2). In other words, the Court, in its discretion, will only award the attorneys fees Waukegan incurred to bring its counterclaims against American Safety, not the other carriers.

### E.    Interstate's and Waukegan's Cross-Motions for Summary Judgment.

Waukegan's counterclaims against Interstate states claims for breach of contract to defend, settle, or indemnify Waukegan, for declaratory judgment that Interstate breached its insurance obligations, that it is estopped from raising policy defenses because it failed to defend, that it is obligated to indemnify Waukegan for the Dominguez judgment and costs and related attorney's fees. (Doc. 273, pp. 27-31.) Waukegan does not, however, bring a cause of action against Interstate under

---

[11] Section 155 also allows provides for discretionary penalties against the carrier not to exceed $60,000 or "60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs." *See* 215 ILCS 5/155(1)(a)-(b). In its discretion, the Court declines to award Waukegan these additional penalties.

Section 155.  The Court finds that Interstate had no duty to defend, its voluntary assumption policy defense does not apply, and, under the terms of its policy, it must indemnify the City for its loss above the amount paid by American Safety, up to its policy limits.

### 1.    The Interstate Policy Was Triggered.

Interstate does not deny that its policy and American Safety's Policies apply to the types of civil rights claims advanced in the Underlying Complaint.  Instead, Interstate piggybacks on American Safety's trigger arguments and asserts that Waukegan is not entitled to coverage with respect to the Dominguez judgment because none of the relevant events occurred during the effective dates of Interstate's policy.  As explained in above, however, Dominguez's federal and state law malicious prosecution claims triggered coverage at the time of his exoneration on April 26, 2002. *See McFatridge*, 604 F.3d at 344.  This date falls undisputedly falls within the policy period for Interstate's policy of November 1, 2001 and November 1, 2002.

### 2.    Interstate Had No Duty to Defend, and Is Not Estopped From Raising Policy Defenses.

Waukegan asserts that Interstate breached its duty to defend and seeks declaratory judgment that Interstate must indemnify it for its loss as a result of the Dominguez verdict to its policy limits ($10,000,000).  The provisions of the Interstate Policy are clear that Interstate had no duty to defend Waukegan.   Interstate's Policy explicitly states that Coverage A, the excess coverage applicable here,[12]

---

[12]Interstate's policy has two coverages, A and B.  Coverage A, titled "Excess Liability Coverage" applies "only to liability and damages covered by the underlying insurance."  (Waukegan v. Interstate 56.1 Resp. ¶ 39; Waukegan v. Interstate 56.1 Exhibit 10.)  Coverage B, titled "Umbrella Liability Coverage," does not apply where there is coverage from the underlying insurance.  Here, American Safety's policy is the "underlying insurance," and the Court has found coverage for the Dominguez suit under that policy.  Consequently, the Court concentrates its analysis on Coverage A.

applies only to liability and damages covered by the 'underlying insurance' scheduled on this policy and is subject to the same terms, conditions, agreements, warranties, exclusions, definitions and limitations as the [American Safety Policy] which [is] incorporated as part of this policy as applicable to Coverage A, *except for: . . . 3. Any duty to investigate or defend, or to pay for any investigation or defense . . . .*

Moreover, the policy states that Interstate has the "discretion" to investigate or settle any suit, and that it has "the right and opportunity, but not the obligation, to associate with the insurers of those policies in the investigation and settlement of any claim or defense of any 'suit' . . . ." These provisions are consistent with the typical role of an excess insurer; indeed, generally the primary insurance attaches immediately and so that insurer has a duty to defend, whereas the liability of an excess carrier attaches after a predetermined amount of primary insurance coverage is exhausted. *See Krusinski Const. Co. v. Northbrook Prop. & Cas. Ins. Co.*, 760 N.E.2d 530, 537 (Ill. App. Ct. 2001). Secondary coverage is not collectible, that is, until all limits of primary coverage are exhausted. *See Kajima Const. Serv's, Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 313 (Ill. 2007). Unlike American Safety's Policy, Interstate's Policy does not impose an automatic duty to defend, but rather provides that Interstate has discretion as to whether to defend.

Waukegan asserts Interstate's Policy creates a duty to defend in at Part II, Section A, which states that Interstate:

will assume control of the investigation and settlement of any claim, or defense of any 'suit' brought in the United States of America (including territories and possessions), Puerto Rico or Canada, against any 'insured' seeking damages to which this policy applies:

a.  Under Coverage A, when the applicable limits of 'underlying insurance' and 'other insurance' have been exhausted by payments of 'loss,' or expenses if included within the limits of insurance, arising from 'occurrences' to which this policy applies . . . .

Waukegan argues that Interstate's duty to defend was thus triggered as soon as the judgment was entered, because at that point American Safety's policy limit of $1,000,000 was exhausted.

However, Interstate's policy clearly states that, under Coverage A, this mandatory duty to defend is not imposed on Interstate until the underlying insurance—American Safety's—is exhausted through *payment* of loss or expenses. American Safety has not paid anything to Waukegan yet, and through this Order, it has been determined, subject to appeal, that American Safety's policy covers the Dominguez claim. This section does not create a duty to defend for Interstate either.

Waukegan also asserts a breach of contract claim against Interstate. The elements of a breach of contract claim under Illinois law are: (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach. *See Roberts v. Adkins*, 921 N.E.2d 802, 811 (Ill. App. Ct. 2010). A party's "failure to comply with a duty imposed by the contract gives rise to the breach." *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999). In support of its claim for breach of contract, Waukegan recites many facts about Interstate's communications between Interstate, Waukegan, and American Safety representatives leading up to the Dominguez trial. Waukegan, however, fails to cite any specific provision of Interstate's Policy that it alleged Interstate breached. (*See, e.g.*, Doc. 467, pp. 11-13.) Although the City argues Interstate's claim handling guidelines required handlers to "promptly formulate coverage positions . . . no later than 30 days after receipt or as required by statute" or communicate a reason why no position can be formulated within 30 days, it does not show, nor do the undisputed facts support, that these guidelines were part of a binding and valid contract between Waukegan and Interstate.

At best, Waukegan's breach of contract claim may be construed as a breach of the duty to defend that Waukegan claims was triggered upon the verdict in this case. Indeed, Waukegan construes it as such in its reply brief. (*See* Doc. 703, p. 11) ("Interstate failed to settle or defend, failed to file a timely declaratory judgment action, and later failed to indemnify the City . . . [s]uch

conduct constitutes a breach of the promises made to the City . . . .")  If so, however, not only has the Court found that Interstate had no such duty to defend, but the factual recitation that Waukegan offers to support its claim, almost all of which pertained to its communications with Interstate before the Dominguez verdict, do not show a breach of this duty to defend.  Waukegan may also be arguing that Interstate breached its duty to investigate the Dominguez claim or settle within its policy limits. But under the clear terms of the Interstate Policy, it has discretion as to whether it investigates or settles any claim.  Its duty to assume control of investigation or settlement only attaches upon payment of loss by American Safety.  Under the clear terms of the policy, Interstate had no duty to investigate, settle or defend that it could breach.

The estoppel doctrine applies only where an insurer has breached its duty to defend. Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered.  *Ehlco*, 708 N.E.2d at 1135.  As Interstate had no duty to defend, it is not estopped from raising policy defenses.

### 3. Interstate's Voluntary Assumption Policy Defense Fails.

Interstate raises one policy defense: its policy provision that Waukegan is not entitled to "voluntarily make a payment, assume any obligation or incur any expense" without Interstate's consent.  Interstate, incorporating the arguments in Northfield/Underwriters' summary judgment briefing concerning the duty to indemnify (*see* Docs. 429, 430, and 679), asserts that Waukegan voluntarily assumed responsibility for paying the judgment against Hendley, thereby excusing Interstate from indemnification.  Waukegan counters that there was nothing voluntary about it - rather, Waukegan was obligated to pay the judgment against its employee Hendley under the Illinois Local Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq*.) ("Tort Immunity Act").

The Dominguez court entered an order dismissing Waukegan as a party in the middle of trial on October 13, 2006, in "accordance with [its] oral ruling" of that same day, and on December 13, 2006, the court entered a judgment order vacating the prior dismissal of Waukegan as a defendant based on Waukegan's "binding admissions" that it would indemnify Hendley for all compensatory damages and attorney's fees for which he was held liable.

Under the clear terms of the policy provision at issue, the assumption of an expense or obligation must be voluntary, not a requirement under the law. Waukegan cites two provisions of the Tort Immunity Act to support its position that it was legally obligated to pay the judgment against Hendley. The first, Section 2-302, states:

> If any claim or action is instituted against an employee of a local public entity based on an injury allegedly arising out of an act or omission occurring within the scope of his employment as such employee, the entity *may elect* to do any one or more of the following:
>
>     (a)    Appear and defend against the claim or action;
>
>     (b)    Indemnity the employee or former employee for his court costs or reasonable attorney's fees, or both, incurred in the defense of such claim or action;
>
>     (c)    Pay, or indemnify the employee or former employee for a judgment based on such claim or action, or
>
>     (d)    Pay, or indemnify the employee or former employee for, a compromise or settlement of such a claim or action.

745 ILCS 10/2-302 (emphasis added). The second, Section 9-102, states:

> A local public entity is empowered *and directed* to pay any tort judgment or settlement for compensatory damages (and may pay any associate attorney's fees and costs) for which it or an employee while acting in the scope of his employment is liable in the manner provided by this article.

745 ILCS 10/9-102 (emphasis added). While Interstate correctly points out that the Section 2-302 is permissive ("may elect"), Section 9-102's language is mandatory ("directed"). Section 9-102 requires municipalities to pay tort judgments against employees acting within the scope of their municipal employment. *See, e.g., Argento v. Village of Melrose Park*, 838 F.2d 1483, 1494 (7th Cir.

1988) ("Section 9-102 makes the [municipality] liable for the payment of any tort judgments . . . entered against one of its employees as long as the employee was acting in the scope of his employment.")  Here, as discussed above, there is no factual dispute that Hendley was a police sergeant conducting law enforcement activities during the Dominguez investigation. *See Wilson v. City of Chicago*, 120 F.3d 681, 686 (7th Cir. 1997) (finding a police officer was acting "squarely" in the scope of his employment and noting that the officer was enforcing criminal law even if his investigations used "improper means.")

Interstate raises three arguments that the City voluntarily assumed liability for the Hendley judgment.  First, Interstate points to deposition testimony by Waukegan's Rule 30(b)(6) witness that the City had a policy of paying judgments against its police officers to make its police force happy.  However, the City's rationale for its policy does not supercede Section 9-102.  Waukegan must follow Section 9-102 even if it upset the City's police officers.

Second, Interstate claims that the City voluntarily assumed Hendley's judgment because it did not assert a statute of limitations defense to the Dominguez's claim, under Section 2-302, against Waukegan, as Hendley's employer.  The statute of limitations for claims under the Tort Immunity Act is one year.  *See* 745 ILCS 10/8-101; *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (noting "Illinois local governmental entities . . . benefit from a one-year statute of limitations for 'civil actions' against them).  Dominguez brought the Underlying Complaint just under two years after his exoneration.  Interstate asserts that City should have moved to dismiss Count VII of the Underlying Complaint, which sought indemnification from the City for the acts of its police officers, because it was not brought within a year.  However, regardless of when it is first brought (either with the original complaint or after judgment), a Tort Immunity Act claim accrues for statute of limitations purposes when the judgment is entered against the municipal employee. *See Wilson*, 120

F.3d at 685 (7th Cir. 1997) (finding a plaintiff did not have to wait until he won a judgment against the city to bring a Section 9-102 claim); *Loza v. City of Chicago*, No. 09C2474, 2009 U.S. Dist. LEXIS 89582, at *3 (N.D. Ill. Sept. 25, 2009) (applying *Wilson* where a plaintiff brought his claims within the two years of the alleged civil rights violation, but after one year had passed and denying a motion to dismiss a Section 9-102 claim on statute of limitations grounds, noting "[t]he logical implication of the *Wilson* decision is that the actual fact that gives rise to a claim under § 9-102 is the court entering judgment against the employee defendant, even though it may be appropriate for a plaintiff to bring the claim in anticipation of that fact"). Any statute of limitations challenge by the City would have failed under binding Seventh Circuit precedent.

Third, Interstate points to Section 1-4-6 of the Municipal Code, which states, in relevant part:

In case any injury to the person . . . is caused by a member of the police department [in a city with a population under 500,000] . . . the municipality . . . shall indemnify the police officer for any judgment recovered against him or her as the result of such injury . . . to the extent of not to exceed $1,000,000 including costs of the action.

65 ILCS 5/1-4-6. Interstate claims that under this provision, Waukegan could only assume $1,000,000 of the Hendley judgment, making the large remaining amount voluntary. Further, Interstate asserts that Section 1-4-6 is the true indemnity provision applicable to the City, while Section 9-102 merely lays out the methods that the City may use to satisfy its judgments. The Seventh Circuit has foreclosed Interstate's argument in *Argento* and *Wilson*. In *Argento*, the municipality, seeking to limit its exposure, asserted that as a matter of statutory construction, Section 1-4-6 was the more particular statute because it concerned police officers specifically and controlled over the general provisions of Section 9-102. *Argento*, 838 F.2d at 1493. The Seventh Circuit found that "[Section 1-4-6] only comes into play if the *police officer . . . seeks indemnity* from a municipality after liability has been imposed on the officer." 838 F.2d at 1494 (emphasis added).

Nine years later, in *Wilson*, the Seventh Circuit reiterated its analysis, interpreting Section 9-102 together with 65 ILCS 5/1-4-5 ("Section 1-4-5 "), the version of Section 1-4-6 that applies to municipalities with over 500,000 people. *Wilson*, 120 F.3d at 686. There, the court found "Section 1-4-5 confers a right on the [municipal] employee, [S]ection 9-102 confers a right on the victim of the employee's tort . . . [the city] must pay the victim, and then seek what relief it can against the employee who is responsible." *Id.* Consequently, Section 1-4-6 does not affect the operation of Section 9-102, which requires Waukegan to pay the Hendley judgment.

Waukegan's "binding admissions" relied upon by the district court referred to in vacating its dismissal of Waukegan acknowledged the City's obligations under Section 9-102. The City's assumption of Hendley's liability was not voluntary because the City was "directed" under the law to pay that judgment under the law. Interstate's voluntary assumption policy exclusion does not apply.

### 4. Interstate Must Indemnify Waukegan.

Waukegan seeks declaratory judgment that Waukegan must indemnify the City for the loss it sustained in the Dominguez Civil Suit. The Interstate Policy states:

> We will pay on behalf of the 'insured' that part of the 'loss' to which this insurance applies, in excess of the total applicable limits of 'underlying insurance' and any 'other insurance', that the 'insured' becomes legally obligated to pay as damages ...

The policy further defines "loss" (under Coverage A) as "those sums actually paid in settlement of a claim or suit or satisfaction of a judgment which the 'insured' is legally obligated to pay as damages because of covered injury, damage or offense . . . ." The policy limit for an occurrence under the Interstate Policy is $10,000,000.

Under these policy provisions, Interstate must indemnify the City for the amounts above the American Safety policy, up to the policy limits. Waukegan's loss as a result of the Dominguez suit

is $11,397,195.39, the amount it paid to satisfy the Dominguez judgment. Waukegan is responsible for the first $100,000 of that loss, under the American Safety policy's SIR provision. American Safety is responsible for the next $1,000,000 as primary insurer, plus the amount in costs and interest to be determined. Interstate is responsible for the remaining amount of the $11,397,195.39 loss, up to its $10,000,000 policy limits.

### F. Underwriters' and Northfield's Motions for Summary Judgment on the Trigger Issue and Waukegan's Motions for Summary Judgment against Underwriters and Northfield

In its operative counterclaim, Waukegan raises the following causes of action against both Northfield and Underwriters: breach of contract for failing to honor its agreement to defend and indemnify Waukegan in the Dominguez Civil Case; declaratory judgment that Underwriters and Northfield breached the policies, are estopped from raising coverage defenses, and must indemnify Waukegan; and finally Section 155 claims for violations of the Illinois Insurance Code, alleging that Underwriters and Northfield should be required to reimburse Waukegan for all attorneys fees incurred. In Northfield's and Underwriters' first joint motion for summary judgment against Waukegan, they seek summary judgment based on the theory that their policies were not triggered, thus excusing any duties to defend or indemnify on their parts and requiring summary judgment in their favor on the breach of contract and declaratory judgment counts. They also argue in this motion that summary judgment should be granted on the Section 155 claims because a bona fide dispute as to coverage issued. The City asserts that Northfield's and Underwriters' policies were triggered under a "multiple" trigger theory.

### 1. The Underwriters/Northfield Policies Were Not Triggered.

The Underwriters/Northfield policies, in their various formulations, were in effect between November 1991 and November 1995, when Dominguez was in prison and when he had to register

as a sex offender upon his release in 1993. Again, to determine whether an insurer has a duty to defend, the Court examines "the underlying complaint and the language of the insurance policy," resolving "[a]ny doubts as to whether particular claims fall within the policy . . . in favor of coverage." *See McFatridge*, 604 F.3d at 338. An insurer may, however, "refuse to defend an action in which, from the face of the complaint, the allegations are clearly outside the bounds of the policy coverage." *See id.* Underwriters and Northfield argue that the allegations in the Dominguez Civil Case were clearly outside the bounds of policy coverage because the dates when those claims accrued fall outside the Underwriters/Northfield policy periods.

To begin, the Underwriters/Northfield policies contemplated coverage for the types of injuries alleged in the Dominguez Civil Case. The "law enforcement liability" section of the policy states that the insurers will "indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of errors, omissions, or negligent acts arising out of the performance of the Assured's duties while acting as a law enforcement official or officer in the regular course of public employment . . . arising out of any occurrence from any cause on account of Personal Injury. . . ." This provision makes clear that the policy covers injuries like Dominguez's for false arrest and malicious prosecution arising out of the police duties of Waukegan police officers. The policies also contain a provision providing that Willis Corroon Administrative Services Corporation, the "Service Organisation," has the duty to "defend all claims or losses."

However, the policies also clarify, at the end of this sentence, that the insurers must indemnify the City only for occurrences "happening during the period of this insurance." The definition of "occurrence" itself states that it means "an accident or a happening of an event or a continuous exposure to conditions which result in personal injury or damage to property during the policy period." Moreover, at the beginning of the section outlining "Law Enforcement Liability,"

the Underwriters/Northfield policies clarify that "[t]his Section applies only to bodily injury, personal injury, or property damage which occur during the policy period." This language is nearly identical to that at issue in *McFatridge*, which defined "occurrence" as "an event, including continuous or repeated exposure to conditions, which results in personal injury ... sustained during the policy period." *See* 604 F.3d at 340. It is undisputed that Underwriters and Northfield's law enforcement liability policies were only if effect between November 1, 1991 and November 1, 1995. Thus, there policies post-dated the trigger of coverage for the Dominguez false arrest claim which undisputedly accrued sometime in 1989 or 1990, and pre-date the trigger of coverage for the Dominguez malicious prosecution claim, which undisputedly occurred on April 26, 2002, under the analysis above.

The only events described in the Underlying Complaint that occurred during the course of the Underwriters and Northfield policies were Dominguez's continuing service of his criminal sentence and sex offender registration. Waukegan responds by alleging that this continuing service and the continuing requirement that Dominguez register as a sex offender triggered coverage under a "multiple" trigger theory, claiming that his Section 1983 claims allege ongoing civil rights violations to which he had continuous or repeated exposure.

The Seventh Circuit in *McFatridge* foreclosed the "multiple" trigger argument the City makes here. The underlying case at issue in *McFatridge* had alleged nearly identical claims to those at issue here, including Section 1983 claims for false imprisonment, deprivation of the right to a fair trial and for wrongful conviction, due process claim for deprivation of access to courts, as well as state law claims for false imprisonment malicious prosecution, intentional infliction of emotional distress and conspiracy. *See Cty. of Edgar v. National Cas. Co.*, Brief of Appellants Michael McFatridge and the County of Edgar, 2009 WL 1209449 (7th Cir. April 22, 2009). In *McFatridge*,

the plaintiff was arrested for murder in 1987 but had his conviction overturned in 2003. *McFatridge*, 604 F.3d at 337. The county sought coverage under a series of insurance policies in effect between 1997 and 1999, among others. *Id.* The underlying complaint alleged that the plaintiff his incarceration and his claim for deprivation of access to the courts occurred during that 1997-1999 policy period. *Id.* at 337-39. The county argued in that case "that coverage is triggered under the [policies in place between 1997 and 1999] because [the prosecutor's] misconduct was an *ongoing tort* that continued from [the plaintiff's] arrest in 1987 until his release in 2003." *Id.* at 344 (emphasis added). The Seventh Circuit rejected the county's argument, the same argument Waukegan makes here. Instead, it found that "none of the [federal or state] offenses occurred during the CGL policy periods" of 1997 to 1999. *Id.* In other words, it held that occurrence policies like the Underwriters/Northfield policies are not triggered by incarceration between the triggering events of arrest and exoneration. *Id.*

Waukegan argues that Dominguez suffered continuing civil rights injuries based on his conviction for sexual assault and subsequent registration and then failure to register as a sex offender. Applying *McFatridge,* none of his actual denial of due process claims were reversed until April 26, 2002, which is the date that all of his claims for "denial of due process" occurred because they require proof that the "conviction has been reversed on direct appeal." *See id.*. Because the policies in question were not triggered, the 1997-1999 carriers in *McFatridge,* like Northfield and Underwriters here, had no duty to defend or idemnify. *Id.* at 340.

Further, although the "multiple" trigger theory has been applied in cases involving latent injury, such as asbestos, or progressively worsening injuries, such as sexual abuse and environmental contamination, courts have consistently rejected this approach in cases involving civil rights claims like those at issue here. *See Idaho Counties Risk Mgmt. Program Underwriters v.*

*Northland Ins. Co.*, 205 P.3d 1220, 1224 (Idaho 2009) (rejecting application of the multiple trigger theory); *North River Ins. Co. v. Broward Cty. Sheriff's Office*, 428 F.Supp.2d 1284, 1292 (S.D. Fl. 2006) (rejecting the multiple trigger theory in the civil rights context); *see also Am. Motorists Ins. Co. v. Southern Sec. Life Ins. Co.*, 80 F.Supp.2d 1280, 1284 (M.D. Ala. 2000) ("In declining to apply the exposure theory in this case, the court notes that an exposure theory is inapposite where it is possible to determine exactly when the bodily injury begins."); *Coregis Ins. Co. v. City of Harrisburg*, No. 03-920, 2006 WL 860710, at *9 (M.D. Pa. Mar. 30, 2006) (noting "the multiple trigger theory has been adopted in very limited circumstances, such as asbestosis, where the injuries caused by exposure do not manifest themselves until a substantial time after the exposure causing the injury . . . . Courts have justified use of a multiple trigger theory of liability in such cases due to a long latency period of the injuries caused by asbestosis and similar disease, and concern that insurers facing numerous future claims would terminate coverage . . . . such policy considerations [are inapplicable in malicious prosecution cases because in those cases] there is no interval between arrest and injury that would allow an insurance company to terminate coverage.") (internal quotations omitted).

Indeed, Waukegan cites no authority applying the theory in the civil rights context, nor does it cite any authority holding that sex offender registration or incarceration triggers coverage under an insurance policy. In *Idaho Counties*, for example, the court rejected a continuing trigger argument when construing identical language at issue in the Underwriters/Northfield policies, which define "occurrence" as:

> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which result in personal injury or damage to property during the policy period. All personal injuries to one or more persons and/or property damage arising out of an accident or event or a continuous or repeated exposure to conditions shall be deemed one occurrence.

*See Idaho Counties*, 205 P.3d at 1224. The court explained that, under the clear and unambiguous meaning of this language "continuing torts are considered to be a single occurrence" and that "an occurrence requires a resultant injury, so we consider the time of an occurrence as being when the injurious effect first manifests itself." *Id.* at 1226. Similarly in *North River*, the court found the continuous exposure argument unavailing in the civil rights context, because unlike in cases of asbestosis or environmental contamination, where the consequence does not become manifest until years after the exposure, in malicious prosecution and false arrest cases the events of the arrest or exoneration take place at a discrete time that can be measured again the policy period. *See North River,* 428 F.Supp.2d at 1292.

Waukegan relies on *Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Insurance Co.*, 685 N.E.2d 934 (Ill. App. Ct. 1997), a negligent supervision case, to support the application of an ongoing trigger theory under Illinois law. There, the court explained that where a "diocese receive[d] warnings about a priest's misconduct and fail[ed] to take remedial action, then a second occurrence takes place and policy coverage is triggered again by any subsequent injury resulting from the omission." *Id.* at 938. The Court further held that "the repeated 'exposure' of the minor to the negligently supervised priest that could constitute an occurrence and provide the basis for indemnification," such that "the negligent supervision constitutes an occurrence in each policy period and each policy's coverage is triggered by the first instance of abuse occurring during its period of coverage." *Id.* at 938-39. Waukegan argues that the Dominguez Civil Complaint "identifies ongoing exposure to civil rights violations," including the involuntary requirement that he register as a sex offender in 1993 and annual requirements to continue to report." (Doc. 585, p. 7.)

However, the theory of liability in the Dominguez Civil Complaint is not an ongoing theory of liability. Unlike in *Roman Catholic Diocese*, 685 N.E.2d at 938, where the illegal events of abuse underlying the lawsuit continued to occur throughout the policy periods, Dominguez's registration as a sex offender as a condition of his parole, and his conviction for failure to timely register, was a consequence of his earlier conviction and a continuation of the penalty phase that arose out of his arrest and conviction prior to the Underwriters/Northfield policy periods. In other words, unlike in *Roman Catholic Diocese* where each instance of abuse resulting from the negligent supervision was independently illegal, *see* 685 N.E.2d at 938, if Dominguez's initial arrest and conviction has been legal, then all of the other actions, including his incarceration and registration as a sex offender, would have been legal. It is that reasoning that underlies the Court's finding in *McFatridge*, relying on *Heck*, 412 U.S. at 486-87, that "[the underlying plaintiff] did not have a complete cause of action, and there was no offense of wrongful conviction or deprivation of due process until . . . the district court issued the writ of habeas corpus." It is also for that reason that the underlying district court case affirmed by the Seventh Circuit in *McFatridge*, 604 F.3d at 340, the court expressly rejected a comparison of the trigger analysis in sex abuse cases with civil rights cases. *See TIG Indemnity Co. v. McFatridge*, No. 06-C-2008, 2007 WL 1063018, at *3 (C.D. Ill. March 30, 2007).

Because the Northfield/Underwriters policies were not triggered by the claims alleged in the Dominguez Civil Case, "the insurers have no duty to defend under the law enforcement policy," *see McFatridge*, 605 F.3d at 343. Thus, Northfield and Underwriters did not breach their duty to defend, and because an insurer "has no duty to indemnify" if it "has no duty to defend," *see id.* at 338, Waukegan cannot succeed on either its breach of contract or declaratory judgment claims against Underwriters or Northfield.

## 2. Underwriters and Northfield Are Not Liable Under Section 155.

The only claims remaining against Underwriters and Northfield are the claims for attorneys fees under Section 155. As explained above, under Section 155, the Court may award attorneys' fees and other penalties only where the evidence shows that the insurer's behavior was "unreasonable and vexatious." This means that an insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *See Citizens First*, 200 F.3d at 1110 (internal citations omitted). Here, Underwriters and Northfield had a bona fide dispute regarding coverage based on when the underlying events should be deemed to have "occurred under the law," and their conduct was not vexatious or unreasonable. *See, e.g.*, *Butler v. Economy Fire & Cas. Co.*, 557 N.E.2d 1281, 1287 (Ill. App. Ct. 1990) (explaining that even where the court arrives "at an interpretation of the policy different from that advanced by the defendant," it "was reasonable for the trial court to conclude that the dispute over coverage was *bona fide*").

The Court grants Underwriters' and Northfield's motion for summary judgment on the trigger issue because their policies were not triggered, and denies Waukegan's independent motions for summary judgment against Underwriters and Northfield. Northfield's and Underwriters' motions for summary judgment on the issues of the duty to defend and the duty to indemnify are denied as moot.

## F. Waukegan's and Westport's Motions for Summary Judgment.

Waukegan raises the same claims against Westport as it does against Northfield and Underwriters: for failure to defend and indemnify Waukegan in the Dominguez Civil Case, for

declaratory judgment that Westport cannot raise policy defenses and must now indemnity the City, and finally that Westport is liable under Section 155. The Court grants Westport's motion for summary judgment on these claims for the same reasons that it grants Northfield's and Underwriters's motion for summary judgment on the trigger issue.

### 1. Westport's Policies Were Not Triggered.

It is undisputed that Westport's policies—whether primary or excess (umbrella)—were in place between November 1, 1997 to November 1, 2000. Like the Northfield and Underwriters policy periods, that period falls between Dominguez's 1989 arrest and his exoneration in 2002. The only allegation from the Underlying Complaint that Waukegan claims falls during the Westport Policies' three year window is Dominguez's arrest, detention and conviction for failing to register as a sex offender in November 1998. (Doc. 477 at 5). As a result of that conviction, Dominguez was sentenced to two years probation, sex offender therapy and community service. The City, under the same "multiple" trigger theory, claims that this arrest and conviction triggered "a separate and discrete substantive due process claim calling for an examination of the liberty and property deprivations causing injuries that were manifested when sexual offender registration was imposed." (Doc. 477 at 8.) Again, this conviction was a consequence of Dominguez's original conviction for rape, which required the sex offender registration. He would not have missed the registration deadline if he did not have to register as a sex offender in the first place. Indeed, he was exonerated from this conviction in April 2002 as part and parcel of his exoneration for original conviction. Under the same analysis above for the Northfield and Underwriters policies, the Westport Policies were not triggered by Dominguez's conviction for failing to register as a sex offender.

Waukegan also asserts that the Westport Policies do not "limit its law enforcement liability to occurrences during the policy period," the same argument the City asserted against American

Safety. Specifically, the City claims that the general liability coverage provision specifically states "[t]he above stated coverage applies only if the "Occurrence" or offense occurs during the policy period," while the law enforcement liability coverage provision does not have similar language. However, like the American Safety Policies, the Westport Policies unquestionably only cover occurrences within their stated policy periods. The Westport primary policies state "[w]e will pay only for loss that you sustain during the Policy Period shown in the Declarations of this Policy," while the Westport excess policies limit coverage to the "Policy Period." The only reasonable interpretation of the Westport Policies is that they provide law enforcement coverage within their stated policy periods. Because the Westport policies were not triggered, Westport is entitled to summary judgment on the City's breach of contract and declaratory judgment claims.

### 2. Westport Is Not Liable Under Section 155.

Westport is not liable under Section 155 for the same reasons that Northfield and Underwriters are not liable. Westport has demonstrated that there was a bona fide dispute regarding whether there was coverage of the Dominguez claim, and Westport entitled to summary judgment on the City's Section 155 claim.

### III.   CONCLUSION AND ORDER

For the reasons stated above, the Court enters the following Order:

American Safety's (Doc. 563) and Interstate's (Doc. 561) motions to strike Waukegan's Rule 56.1 statements are granted per Part I above.

American Safety's motion for summary judgment against Waukegan (Doc. 444) is denied, and Waukegan's motion for summary judgment against American Safety (Doc. 458) is granted to the extent detailed below. Specifically, the Court enters declaratory judgment that:

70

A.  American Safety breached its policy by failing to defend Waukegan in the Dominguez Civil Case;

B.  American Safety is estopped from raising policy limitations, exclusions or other defenses to coverage because it failed to provide a defense, failed to defend at trial under a reservation of rights provision and failed to file a timely declaratory judgment action, even though it was on actual notice of the Dominguez Claim;

C.  American Safety breached the provisions of its insurance contracts and is obligated to indemnify the City for the judgment in the *Dominguez* action (beyond the $100,000 SIR) to the policy limits of $1,000,000. Further, American Safety is responsible for Waukegan's attorneys' fees and costs for the defense of the *Dominguez* lawsuit, in the amount of $1,079,296.90, as well as the costs and interest above the Dominguez verdict as set out in American Safety's policy, in an amount to be determined by American Safety and Interstate and jointly filed with the Court within seven (7) days of entry of this Order;

D.  American Safety acted unreasonably and vexatiously in violation of 215 ILCS 5/155;

E.  Waukegan is entitled the attorneys' fees and costs incurred in litigating this declaratory judgment action against American Safety, to be set out in a fee petition filed with the Court within seven (7) days of entry of this Order.

The Court denies in part, and grants it in part, Waukegan's motion for summary judgment against Interstate (Doc. 533 (amending 466)). The Court denies Waukegan's motion for summary

judgment on its breach of contract claim against Interstate, but enters declaratory judgment that Interstate must indemnify the City in the amount remaining from the City's $11,397,195.39 loss after American Safety has fulfilled its obligation as the primary carrier. The Court orders the parties to determine American Safety's responsibility within seven (7) days per its instructions above. The Court grants Interstate's motion for summary judgment against Waukegan (Doc. 448) on the City's breach of contract claims, but denies its motion for summary judgment on Waukegan's declaratory judgment claim.

The Court grants Underwriters' and Northfield's motion for summary judgment on the trigger issue (Docs. 450), and denies Waukegan's independent motions for summary judgment against Underwriters and Northfield (Docs. 535 (amending 491), 537 (amending 498)). Northfield's and Underwriters' motions for summary judgment on the duty to defend and the duty to indemnify issues (Docs. 435, 429) are denied as moot.

The Court grants Westport's motion for summary judgment against Waukegan (Doc. 460), and denies Waukegan's motion for summary judgment against Westport (Doc. 539 (amending 476)).

The Court denies as moot Waukegan's objection (Doc. 781) to Magistrate Finnegan's Order of December 17, 2010 denying Waukegan's motion to compel.

SO ORDERED.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

March 3, 2011